IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

THUY TRONG LE and KIM CHI VO,        )
d/b/a NAIL STUDIO AND SPA,           )
                                     )
            Plaintiffs,              )
                                     )
v.                                   )        CASE NO-2:07-cv-1070- WKW
                                     )
ARCITERRA GROUP, LLC, d/b/a          )
ARCITERRA FESTIVAL                   )
MONTGOMERY AL, LCC,                  )
                                     )
            Defendant.               )

## MOTION TO DISMISS

**COMES NOW** the Defendant, **ArciTerra Group, LLC** ("ArciTerra Group"), and pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, moves the Court to dismiss the Complaint against it and in support hereof states as follows:

1.      ArciTerra Group is sued as ArciTerra Group, LLC *d/b/a ArciTerra Festival Montgomery, AL, LLC* ("ArciTerra Festival"). However, ArciTerra Group is the manager of ArciTerra Festival, a separate foreign corporation registered to do business in the state of Alabama with the Alabama Secretary of State. (Exhibits A and B.) "ArciTerra Group d/b/a ArciTerra Festival" is the sole Defendant in a civil action commenced in the Circuit Court of Montgomery County, Alabama, Case No. CV 2007-1743. Service of Process was made upon Defendant ArciTerra Group on or about November 8, 2007. Separate service of process has not been made nor attempted on ArciTerra Festival.

2.      ArciTerra Group is a limited liability company organized in and under the laws of the

1

State of Arizona. ArciTerra Group's principal office and place of business is located at 2720 East Camelback Road, Suite 220, Phoenix, Arizona, 85016. ArciTerra Group has no offices nor employees in the state of Alabama. (Exhibit B.)

3.      Although the Complaint does not appear to allege a separate and/or independent claim against ArciTerra Festival in its own right, nor has separate and independent service of process been attempted by the Plaintiffs on ArciTerra Festival, ArciTerra Festival's principal office and place of business is also located at 2720 East Camelback Road, Suite 220, Phoenix, Arizona, 85016. ArciTerra Festival also has no offices nor employees in the state of Alabama. (Exhibit B.)

4.      The Complaint seeks a declaratory judgment, specific performance, reformation, recision of a contract, a temporary restraining order, and preliminary and permanent injunction, as well as a claim for tortuous interference with business relations, all arising from an alleged lease agreement by the Defendant with another business allegedly in direct competition with the Plaintiffs' business. (Exhibit C.) The Plaintiffs' business is located within the Festival Plaza Shopping Center at the corner of Taylor and Vaughn Roads in the City of Montgomery, Alabama. Upon information and belief, Festival Plaza is owned and operated by Festival Plaza, LLC, a McClinton & Company company.

5.      ArciTerra Festival owns an out-parcel situated in front of the Festival Plaza Shopping Center commonly referred to as the Men's Wearhouse out-parcel. (Exhibit B.) ArciTerra Festival has entered into a contract with Nails Capitol, LLC, to lease a store within the out-parcel. (Exhibit D.) The Plaintiffs contend that Nails Capitol will compete directly against their business known as Nail Studio and Spa. For this reason, the Plaintiffs contend that the lease agreement is prohibited by a Declaration of Restrictions entered into between Festival Plaza, LLC, and ArciTerra Festival's

2

predecessor-in-interest, JDM, LLC. (Exhibit E.)  Plaintiffs contend that they are third-party beneficiaries of the Declaration of Restrictions and seek to enforce their rights and remedies as third party beneficiaries against the Defendant.  The Complaint states:

> 8.    Plaintiff, as a tenant of Festival Plaza, with a signed valid lease agreement, is an intended beneficiary of the Declaration of Restrictions of which Defendant is to comply. . . .

> 9.    Defendant has violated the restrictions by leasing space in the Outlot to a business that directly competes with Plaintiff's business. . . .

(Exhibit C).

6.    Plaintiffs have failed to state a claim against ArciTerra Group, LLC, for which relief can be granted.  ArciTerra Group is neither a party to the lease agreement involving Nails Capitol, nor is ArciTerra Group a party to the Declaration of Restrictions.  The lease agreement is between ArciTerra Festival and Nails Capitol, LLC.  ArciTerra Group is merely the manager of ArciTerra Festival, a separate limited liability company.  Likewise, ArciTerra Group is not the owner of the Mens Wearhouse out-parcel.  The out-parcel is owned by ArciTerra Festival. (Exhibit B.)  The Declaration of Restrictions is between Festival Plaza, LLC and JDM, LLC, a predecessor-in-interest to ArciTerra Festival.

7.    Moreover, the Plaintiffs lack standing to enforce the Declaration of Restrictions upon which they claim to be third party beneficiaries.  To qualify as a third party beneficiary under Alabama law, with standing to sue on a contract, Plaintiffs must establish that the contracting parties intended, at the time the contract was created, to bestow a direct benefit upon them.  Airlines Reporting Corp. v. Higginbothem, 643 So. 2d 952, 954 (Ala. 1994).  It is imperative that the third party be a "direct beneficiary" under the contract, as opposed to an incidental beneficiary, because

only a direct beneficiary has standing to enforce the agreement. Ex Parte Stamey, 776 So. 2d 85, 92

(Ala. 2000). An inquiry into whether the Plaintiffs are entitled to third party beneficiary status stops

when it is determined from the face and four-corners of the contract that the parties to the contract

did not intend to confer a direct benefit upon them. See Collins Co. v. City of Decatur, 533 So. 2d

1127, 1132 (Ala. 1998).

       8.     Based upon the black-letter wording of the Declaration of Restrictions, the Plaintiffs

are clearly not intended to be direct beneficiaries with the right to enforce the Declaration of

Restrictions. Specifically, the Declaration contains the following unambiguous disclaimer:

> Owner, **_and only Owner,_** shall have the right to obtain injunctive relief to enjoin any
> violation, or the continuation of a violation, of any of the restrictions, covenants,
> terms and conditions of this Declaration.
>
> Nothing herein is intended to create or shall be construed to create any rights
> whatsoever for the benefit of the general public in the Outparcel or Shopping Center
> Parcel or in any improvements constructed thereon.
>
> "Owner" as used herein shall mean the declarant who executes this document
> and its successors and assigns of the Shopping Center Parcel.

(Exhibit E at 8) (emphasis added).

       9.     In the Declaration of Restrictions, the "owner" is identified as Festival Plaza, LLC,

which also executed the Declaration. Accordingly, the Plaintiffs are not third party beneficiaries of

the Declaration of Restrictions and do not have standing to seek injunctive or any form of equitable

relief against Defendant for an alleged violation of the Declaration of Restrictions. See Riscorp, Inc.

v. Norman, 915 So. 2d 1143, 1148-51 (Ala. 2005) (holding that shareholders of an acquired

corporation were not third party beneficiaries of a merger agreement with the acquiring corporation

under Florida law where the merger agreement expressly provided that it was not intended to confer

4

upon any person other than the acquired and acquiring corporations any rights or remedies under the agreement.)[1]

10.    Likewise, the Plaintiffs fail to state a claim for interference with contractual or business relations. There are four elements to such a claim under Alabama law, consisting of the following elements: 1) the existence of a contractual or business relation; 2) the defendant's knowledge of such relation; 3) the intentional interference by the defendant with such relation; and 4) damage to the plaintiff. Ala. Pattern Jury Instr. §10.35 (2d ed 1993).

11.    The legal basis for the Plaintiffs' intentionally interference with business relations claim is their alleged third party beneficiary status under the Declaration of Restrictions. (Exhibit C at ¶¶ 17-19.) However, since the Plaintiffs are not third party beneficiaries entitled to enforce the Declaration of Restrictions, the Plaintiffs have failed to and cannot prove the existence and violation of a contractual or business relation between ArciTerra Group or ArciTerra Festival and the Plaintiffs, or between the Plaintiffs and Nails Capitol, LLC.  For the same reasons, the Plaintiffs cannot establish an intentional interference with business relations by either ArciTerra Group or ArciTerra Festival.  ArciTerra Festival is merely exercising its right, as the owner of the Mens Wearhouse out-parcel, to lease space therein to a tenant. The Plaintiffs are neither tenants in the Mens Wearhouse out-parcel nor do they otherwise have a legally enforceable relationship with ArciTerra Festival or Nails Capitol.

12.    Accordingly, the Plaintiffs' have failed to and cannot state a claim for relief against

---

[1] The Court in Riscorp also relied on 4 *Corbin on Contracts*, § 77 at 25 (1951), which provides as follows: "[I]f two contracting parties *expressly provide* that some third party who will be benefitted by performance shall have *no legally enforceable right*, the courts should effectuate the express intent by denying the third party any direct remedy." 915 So. 2d at 1150.

either ArciTerra Group or ArciTerra Festival. Therefore, the Plaintiffs' claims in their entirety, as well as the Plaintiffs' claims for equitable and injunctive relief, should be rejected and denied and the Complaint dismissed with prejudice.

13.    Plaintiffs' claim are also due to be dismissed against for lack of personal jurisdiction because ArciTerra Group is neither a party nor successor-in-interest to the the Lease Agreement or Declaration of Restrictions underlying the Plaintiffs' claims. ArciTerra Group is an Arizona corporation doing business as the the manager of ArciTerra Festival. The Plaintiffs have failed to allege any acts or omissions by ArciTerra Group that would give rise to jurisdiction over it in the state of Alabama. Therefore, the Plaintiffs' claims against ArciTerra Group must be dismissed for lack of jurisdiction.

14.    To the extent Plaintiffs have attempted to assert a claim against ArciTerra Festival, the Plaintiffs' claim must be dismissed due to insufficiency of process. The only service of process attempted in this case has been attempted upon Defendant ArciTerra Group. The Plaintiffs have failed to state an independent claim or to seek independent service of process on ArciTerra Festival. Therefore, to the extent Plaintiffs seek to assert a claim against ArciTerra Festival, Plaintiffs have failed to perfect service of process or serve ArciTerra Festival with a summons and Complaint, and their claims must therefore be dismissed.

15.    Finally, to the extent Plaintiffs seek to pursue a claim against ArciTerra Group solely as the manager of ArciTerra Festival, the Plaintiffs have failed to join an indispensable party needed for just adjudication pursuant to Rule 19 of the Federal Rules of Civil Procedure.

WHEREFORE, PREMISES CONSIDERED, Defendant ArciTerra Group respectfully requests, for the reasons stated herein, that its Motion to Dismiss be granted and that Plaintiffs claims

against it, as well as the Plaintiffs' request for damages and equitable and injunctive relief, be denied

and dismissed as a matter of law.

Respectfully submitted this the 7th day of December, 2007.

Joe Espy, III (ESP002)
J. Flynn Mozingo (MOZ003)
Attorneys for Defendant

OF COUNSEL:

Melton, Espy & Williams, P.C.
P.O. Drawer 5130
Montgomery, AL 36103
Telephone:     (334) 263-6621
Facsimile:      (334) 263-7252
jespy@mewlegal.com
fmozingo@mewlegal.com

### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing has been filed with the Clerk of the Court on the 7th day of December, 2007, and a copy of same will be served upon the below listed attorney of record via USPS, postage prepaid and properly addressed:

Aaron J. Luck
McPhillips, Shinbaum
Post Office Box 64
Montgomery, AL 36101-0064

OF COUNSEL

7



# CORPORATE DETAILS
## Office of the Secretary of State
## State of Alabama

---

**INITIATE NEW BROWSE**

Company                                                          FLL 612-399
  Legal Name:    Arciterra Festival Montgomery AL, LLC

State Of Reg:    Arizona

Reg Date....:    02-23-2007

Formed Date.:    01-29-2007

Reg Agent...:    NATIONAL REGISTERED AGENTS INC
                 150 S PERRY ST
                 MONTGOMERY, AL  36104

Prin Address:    2720 E CAMELBACK RD  STE 220
                 PHOENIX, AZ  85016

Nat Of Bus..:    ACQUISITION,DISPOSITION,INVESTMENT & MGMT REAL/PERSONAL PROPERTY

**← PREVIOUS PAGE**



---

© 2007, Office of the Secretary of State, State of Alabama



EXHIBIT
A

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| **THUY TRONG LE and KIM CHI VO** ) | |
| **d/b/a NAIL STUDIO and SPA,** ) | |
| ) | |
|     **Plaintiffs,** ) | |
| ) | |
| **vs.** ) | **CASE NO.** _____ |
| ) | |
| **ARCITERRA GROUP, LLC, and** ) | |
| **ARCITERRA FESTIVAL** ) | |
| **MONTGOMERY AL, LLC,** ) | |
| ) | |
|     **Defendants.** ) | |

<u>**AFFIDAVIT OF KRISTINA L. CERVONE**</u>

**COUNTY OF MARICOPA**      )

**STATE OF ARIZONA**          )

    Before me, the undersigned authority, a Notary Public in and for the State of Arizona at Large, personally appeared KRISTINA L. CERVONE, who being known to me and, who being first duly sworn deposeth and says as follows:

    1.    My name is Kristina L. Cervone. I am a citizen of the State of Arizona, residing at 4212 North 42nd Place, Phoenix, Arizona 85018. I am over the age of 21 years, and am competent to give this Affidavit which is based upon my personal and direct knowledge of the matters testified to herein.

    2.    I am employed by ArciTerra Group, LLC ("ArciTerra Group") as a Paralegal, where I serve as liaison between ArciTerra Group's executive officers and outside general and special counsel. I hold a Bachelor of Science Degree in Business from the University of Phoenix and a

**EXHIBIT
B**
tabbies

Paralegal Certificate from Phoenix Career College. I have worked for ArciTerra Group since March 2007, and have worked in the real estate/property management industry since 2002.

3.    ArciTerra Group is a limited liability company organized in and under the laws of the State of Arizona. ArciTerra Group's principal business is real estate investment and development, and its principal office and place of business is located at 2720 East Camelback Road, Suite 220, Phoenix Arizona 85016. ArciTerra Group has no offices or employees in the State of Alabama.

4.    ArciTerra Group is the manager for ArciTerra Festival Montgomery, AL, LLC ("ArciTerra Festival"), a limited liability company organized in and under the laws of the State of Arizona. ArciTerra Festival's principal office and place of business is also located at 2720 East Camelback Road, Suite 220, Phoenix Arizona 85016. ArciTerra Festival also has no offices or employees in the State of Alabama.

5.    ArciTerra Festival is the owner of the real property referenced in the *Original Verified Complaint Including Request for TRO-Injunctive Relief,* more commonly known as the "Men's Warehouse Outparcel," or simply "Outparcel." ArciTerra Festival acquired the real property in August 2007.

6.    Attached herewith as Exhibit A is a true and correct copy of the Lease Agreement between ArciTerra Festival and Nails Capital, LLC, executed on September 18, 2007, for lease of premises in the Men's Warehouse Outparcel. To the best of ArciTerra Festival's knowledge, the Lease Agreement allegedly underlies the claims made in the *Original Verified Complaint Including Request for TRO-Injunctive Relief.* The Lease Agreement was executed on behalf of ArciTerra Festival by Jonathan M. Lamore, who is a resident-citizen of Arizona employed at the

offices of ArciTerra Festival and ArciTerra Group in Phoenix, Arizona.

7.      Under the Lease Agreement, ArciTerra Festival will receive rent from its tenant in the amount of $22.00 per square foot per annum, which is equal to $32,384.00 per year (i.e., $22.00 multiplied by 1,472 sq. feet).  The Lease Agreement is a five-year contract, the value of which equals at least $161,920.

Affiant further sayeth not.

KRISTINA L. CERVONE

SWORN to and SUBSCRIBED before me this the 4th day of December, 2007.

NOTARY PUBLIC
My Commission Expires: 8/31/09

JESSICA J. LANE
Notary Public - Arizona
Maricopa County
Expires 08/31/09

IN THE CIRCUIT COURT
OF MONTGOMERY COUNTY, ALABAMA

THUY TRONG LE and KIM CHI VO,  *
d/b/a NAIL STUDIO AND SPA,      *

    Plaintiffs,                 *

                              CASE #: CV-07- *1743*

vs.                             *

ARCITERRA GROUP, LLC, d/b/a     *
ARCITERRA FESTIVAL MONTGOMERY
AL, LLC                         *

    Defendant,                  *

## ORIGINAL VERIFIED COMPLAINT
## INCLUDING REQUEST FOR TRO–INJUNCTIVE RELIEF

    COME NOW Plaintiffs, by and through the undersigned counsel, and hereby complain of Defendant as follows:

### I. PARTIES, JURISDICTION AND VENUE

    1.    Plaintiff, Thuy Trong Le, is a resident citizen of California, doing business as Nail Studio and Spa and is over 19 years of age.

    2.    Plaintiff, Kim Vo, is a resident citizen of Montgomery County, Alabama, doing business as Nail Studio and Spa and is over 19 years of age.

    3.    Defendant ArciTerra Group, LLC, is a foreign corporation doing business in Montgomery County Alabama as ArciTerra Festival Montgomery AL, LLC, at all times relevant to this complaint.

    4.    All acts and occurrences complained of herein occurred in Montgomery County, Alabama, the amount in controversy exceeds this Court's minimal jurisdictional limit and the relief sought falls under the jurisdiction of the Circuit Court.

**EXHIBIT**

C

## II. FACTS

5.    On or about September 3, 2002, Plaintiff, Kim Vo, and her business partner, Plaintiff Mr. Le, leased property located within the development known as Festival Plaza, in Montgomery, Alabama. Plaintiffs renewed this lease on February 7, 2007 for a period of five (5) years, or through 2012.

6.    Plaintiffs have been a tenant of Festival Plaza continually since the inception of the lease on September 3, 2002. The leased space currently is, and at all times has been, used as a Nail Studio and Spa.

7.    At some point thereafter Defendant entered into an agreement whereby they purchased, leased or otherwise currently manage certain land located within Festival Plaza described as "Outlot #3" or "Men's Warehouse Outparcel" or "Outparcel #3". (Hereinafter referred to as Outlot). As a condition of Defendant purchasing/ leasing or otherwise managing the Outlot Defendant was required to comply with all of the Declaration of Restrictions for the Outlot and Festival Plaza as a whole.

8.    Plaintiff, as a tenant of Festival Plaza, with a signed valid lease agreement, is an intended beneficiary of the Declaration of Restrictions of which Defendant is to comply. Plaintiffs' business interests, as is the case with all of the tenants of Festival Plaza, are specifically tied to and affected by the Restrictions set forth as to the Outlot managed/owned/leased by Defendant.

9.    Defendant has violated the Restrictions by leasing space in the Outlot to a business that directly competes with Plaintiffs' business. The lease of space to a competitive business within Festival Plaza has created disharmony within Festival Plaza.

### III. CAUSES OF ACTIONS

A.     DECLARATORY JUDGMENT

10.     Plaintiffs hereby incorporate by reference paragraphs one (1) through nine (9) above, the same as if more fully set forth herein.

11.     On or about September 3, 2002, Plaintiff, Kim Vo, and her business partner, Plaintiff Mr. Le, leased property located within the development known as Festival Plaza, in Montgomery, Alabama.  Plaintiffs have been a tenant of Festival Plaza continually since September 3, 2002.  The leased space currently is, and at all times has been, open, operational and used exclusively as a Nail Studio and Spa.

12.     The development known as Festival Plaza contains Outlots or Outparcels which have their own Restrictions.  These Outlots also incorporate by reference the Restrictions set forth for Festival Plaza as a whole.  Plaintiffs, as business owners within Festival Plaza must abide by these Restrictions and are intended beneficiaries of the same, to protect their investment and business interests.

13.     At some point after 2002, Defendant entered into an agreement whereby it purchased, leased or otherwise currently manages a certain parcel of land located within Festival Plaza described as "Outlot #3" or "Men's Warehouse Outparcel" or "Outparcel #3" (Outlot).  As a condition of Defendant purchasing/leasing or otherwise managing the Outlot, it is required to comply with all of the Declaration of Restrictions.

14.     Defendant has violated the Restrictions by leasing space located within the Outlot to a business that directly competes with Plaintiffs' business.  The lease of space to a competitive business within Festival Plaza has created disharmony within Festival Plaza.  The lease of this space to a competitive business violates the

Restrictions, specifically, Section 3.3 of the Declaration of Restrictions. Defendant has

been put on notice of the violation of the Restrictions by the developer of Festival Plaza,

Mr. Joel D. McClinton, President of Festival Plaza, LLC. Despite this, and additional

efforts by Plaintiff, Defendant refuses to comply with the Restrictions and has entered

into a lease with a competitive business–a nail salon, that will directly compete with

Plaintiffs' business.

WHEREFORE, premises considered, Plaintiffs move this Court to declare the

rights and responsibilities of Plaintiffs and Defendant under the Declaration of

Restrictions set forth by Festival Plaza.

## B.    TORTUOUS INTERFERENCE WITH BUSINESS RELATIONS

15.    Plaintiffs hereby incorporate by reference paragraphs one (1) through

fourteen (14) above, the same as if more fully set forth herein.

16.    On or about September 3, 2002, Plaintiff, Kim Vo, and her business

partner, Plaintiff Mr. Le, leased property located within the development Festival Plaza,

in Montgomery, Alabama. Plaintiff's have been a tenant of Festival Plaza continually

since September 3, 2002. The leased space currently is, and at all times has been,

used as a Nail Studio and Spa.

17.    The development known as Festival Plaza contains Outlots or Outparcels

which have their own Restrictions. These Outlots also incorporate, by reference, the

Restrictions set forth for Festival Plaza as a whole. Plaintiffs, as business owners

within Festival Plaza must abide by these Restrictions and are intended beneficiaries of

the same, to protect their investment and business interests.

18.    At some point after 2002, Defendant entered into an agreement whereby

it purchased, leased or otherwise currently manages a certain parcel of land located within Festival Plaza described as "Outlot #3" or "Men's Warehouse Outparcel" or "Outparcel #3", (Outlot).  As a condition of Defendant purchasing/leasing or otherwise managing the Outlot it was required to comply with all of the Declaration of Restrictions.

19.     Defendant has violated the Restrictions by leasing space located within the Outlot to a business that directly competes with Plaintiffs' business.  The lease of space to a competitive business within Festival Plaza has created disharmony within Festival Plaza.  The lease of this space to a competitive business violates the Restrictions, specifically, Section 3.3 of the Declaration of Restrictions.  Defendant has been put on notice of the violation of the Restrictions by the developer of Festival Plaza, Mr. Joel D. McClinton, President of Festival Plaza, LLC.  Despite this, and additional efforts by Plaintiff, Defendant refuses to comply with the Restrictions and has entered into a lease with a competitive business–a nail salon, that will directly compete with Plaintiffs' business.

20.     Plaintiff has an existing business and a contractual relationship with Festival Plaza.  Defendant has actual knowledge of this existing business relationship with Festival Plaza, despite this Defendant is intentionally interfering with this business relationship without justification.[1]  Plaintiffs have sustained, and will continue to sustain, damages so long as a competitive business is allowed to operate within Festival Plaza.

WHEREFORE, premises considered, Plaintiffs demand judgment against Defendant, Richard Saliba, for compensatory damages, punitive damages, costs and

---

[1]   Defendant not only has absence of justification but has actual notice of the tortious interference, via letter from the developer of Festival Plaza, Mr. Joel D. McClinton, President of Festival Plaza, LLC, stating it is a violation of the Restrictions to lease this property to a competitive business.

fees in such an amount as a jury deems just and reasonable, under the facts and law of this case, in excess of the minimal jurisdictional limits of the Circuit Court.

C.    SPECIFIC PERFORMANCE - REFORMATION/RECESSION OF CONTRACT

21.    Plaintiffs hereby incorporate by reference paragraphs one (1) through twenty (20) above, the same as if more fully set forth herein.

22.    On or about September 3, 2002, Plaintiff, Kim Vo, and her business partner, Plaintiff Mr. Le, leased property located within the development known as Festival Plaza, in Montgomery, Alabama. Plaintiffs have been a tenant of Festival Plaza continually since September 3, 2002. The leased space currently is, and at all times has been, used as a Nail Studio and Spa.

23.    The development known as Festival Plaza contains Outlots or Outparcels which have their own Restrictions. These Outlots also incorporate, by reference, the Restrictions set forth for Festival Plaza as a whole. Plaintiffs, as business owners within Festival Plaza must abide by these Restrictions and are intended beneficiaries of the same, to protect their investment and business interests.

24.    At some point after 2002, Defendant entered into an agreement whereby it purchased, leased or otherwise currently manages a certain parcel of land located within Festival Plaza described as "Outlot #3" or "Men's Warehouse Outparcel" or "Outparcel #3" (Outlot). As a condition of Defendant purchasing/leasing or otherwise managing the Outlot it was required to comply with all of the Declaration of Restrictions.

25.    Defendant has violated the Restrictions by leasing space located within the Outlot to a business that directly competes with Plaintiffs' business. The lease of space to a competitive business within Festival Plaza has created disharmony within

Festival Plaza. The lease of this space to a competitive business violates Section 3.3 of the Declaration of Restrictions and Defendant has been put on notice of the same by the developer of Festival Plaza, Mr. Joel D. McClinton, President of Festival Plaza, LLC. Despite this, and additional efforts by Plaintiff, Defendant refuses to comply with the Restrictions and plans of leasing the property to a competitive business.

**WHEREFORE,** premises considered, Plaintiffs move this Court to act within it's jurisdictional powers and void the lease entered into between Defendant and the competitive nail business.

D.     TEMPORARY RESTRAINING ORDER

26.     Plaintiffs hereby incorporate by reference paragraphs one (1) through twenty-five (25) above, the same as if more fully set forth herein.

27.     On or about September 3, 2002, Plaintiff, Kim Vo, and her business partner, Plaintiff, Mr. Le, leased property located within the development known as Festival Plaza, in Montgomery, Alabama. Plaintiffs have been a tenant of Festival Plaza continually and without interruption since September 3, 2002. The leased space currently is, and at all times has been, used as a Nail Studio and Spa.

28.     The development known as Festival Plaza contains Outlots or Outparcels which have their own Restrictions. These Outlots also incorporate, by reference, the Restrictions set forth for Festival Plaza as a whole. Plaintiffs, as business owners within Festival Plaza must abide by these Restrictions and are intended beneficiaries of the same, to protect their investment and business interests.

29.     At some point after 2002, Defendant entered into an agreement whereby it purchased, leased or otherwise managed a certain parcel of land located within

Festival Plaza described as "Outlot #3" or "Men's Warehouse Outparcel" or "Outparcel #3" (Outlot). As a condition of Defendant purchasing/leasing or otherwise managing the Outlot it was required to comply with all of the Declaration of Restrictions.

30.     Defendant has entered into a lease with a competitive business which will create irreparable harm to Plaintiffs' business and violate the Restrictions of Festival Plaza if allowed to operate.

31.     A temporary restraining order is required to preserve the status quo until a final determination has been made on the merits.[2] Plaintiffs respectfully submit that it clearly appears from the specific facts shown by this verified pleading and the Memorandum Brief attached hereto that 1) immediate and irreparable harm will result if Defendant is allowed to breach the restrictions; and, 2) Plaintiffs will likely prevail on the merits of the case.

WHEREFORE, premises considered, Plaintiffs respectfully request that this Honorable Court issue a Temporary Restraining Order that will describe in reasonable detail and order that Defendant not allow the competitive business to open until this matter can be heard by the Court and a final determination is made on the merits of the claim.

E.     PRELIMINARY/PERMANENT INJUNCTION

32.     Plaintiffs hereby incorporate by reference paragraphs one (1) through thirty-one (31) above, the same as if more fully set forth herein.

33.     On or about September 3, 2002, Plaintiff, Kim Vo, and her business partner, Mr. Le, leased property located within the development known as Festival

---

[2]     See Plaintiffs' Memorandum Brief in Support of the issuance of the TRO attached here to as Exhibit A.

Plaza, in Montgomery, Alabama. Plaintiffs have been a tenant of Festival Plaza continually since September 3, 2002. The leased space currently is, and at all times has been, used as a Nail Studio and Spa.

34.     The development known as Festival Plaza contains Outlots or Outparcels which have their own Restrictions. These Outlots also incorporate, by reference, the Restrictions set forth for Festival Plaza as a whole. Plaintiffs, as business owners within Festival Plaza must abide by these Restrictions and are intended beneficiaries of the same, to protect their investment and business interests.

35.     At some point after 2002, Defendant entered into an agreement whereby it purchased, leased or otherwise managed a certain parcel of land located within Festival Plaza described as "Outlot #3" or "Men's Warehouse Outparcel" or "Outparcel #3" (Outlot). As a condition of Defendant purchasing/leasing or otherwise managing the Outlot it was required to comply with all of the Declaration of Restrictions.

36.     Defendant has entered into a lease with a competitive business which will create irreparable harm to Plaintiffs' business and violate the Restrictions of Festival Plaza if allowed to operate.

37.     The injunctive relief sought will prevent the competitive business from opening and enforce the Restrictions set forth by Festival Plaza.

**WHEREFORE**, premises considered, Plaintiffs respectfully request that this Honorable Court issue a Permanent Injunction enjoining Defendant from leasing space to a business that is competitive in nature. (In the instant case a Nail Studio/Spa).

Respectfully submitted this 7th day of November, 2007.

Respectfully submitted,

OF COUNSEL:
McPhillips, Shinbaum, LLC
516 S. Perry Street (36104)
P.O. Box 64
Montgomery, AL 36101-0064
Phone 334/262-1911
Facsimile 334/263-2321

AARON J. LUCK (LUC014)

## VERIFICATION OF COMPLAINT

I, Kim Chi Vo, being first duly sworn, depose and say:

I am a resident citizen of Montgomery County, in the State of Alabama. I am the Plaintiff named in the foregoing Complaint. I have read over the Complaint, and the facts stated therein are true and correct according to my information, knowledge and belief.

Kim Chi Vo

Sworn and subscribed before me this the 7th day of November, 2007.

Notary Public

H:\MyFiles\Active Files\Kim\OriginalComplaint.wpd

IN THE CIRCUIT COURT
OF MONTGOMERY COUNTY, ALABAMA

THUY TRONG LE and KIM CHI VO,      *
d/b/a NAIL STUDIO AND SPA,          *

    Plaintiffs,      *

                                   CASE #: CV-07- *1743*

vs.      *

ARCITERRA GROUP, LLC, d/b/a      *
ARCITERRA FESTIVAL MONTGOMERY
AL, LLC      *

    Defendant,      *

## MEMORANDUM BRIEF IN SUPPORT OF PETITIONERS REQUEST FOR TEMPORARY RESTRAINING ORDER AND/OR A PRELIMINARY INJUNCTION

COME NOW the Petitioners and issue this memorandum brief in support of their motion for a temporary restraining order and/or a preliminary injunction in its favor against Defendant.

    (1)    It is undisputed that Plaintiffs currently lease property located within Festival Plaza and have done so continually since 2002. As part of this lease Plaintiffs are subject to, and protected by, the Declaration of Restrictions set forth for Festival Plaza, including its Outlots or Outparcels.

    (2)    The temporary restraining order is requested to preserve the status quo until a final determination has been made on the merits. A temporary restraining order (TRO) may be granted without notice if:

            (a)    it clearly appears from the specific facts shown by a verified pleading or affidavit, (see the Original Complaint for Injunction Relief containing a verified Complaint);

    (b)    immediate or irreparable harm will result;

    ©    before the adverse party or his attorney in opposition is notified. See James M. Patton v. Cumberland Lake Country Club, Inc. 1997 WL 72040 (Ala.Civ.App. 1997).

(3)    After issuance of the TRO, Plaintiffs request that this Court set a hearing for a preliminary injunction at the earliest possible time. **In order for a preliminary injunction to be issued, the following conditions must be met:**

    (a)    A substantial likelihood that Plaintiff will prevail on the merits.

    (b)    A substantial threat that Plaintiff will suffer irreparable injury, if the injunction is not granted. The Petitioners will suffer extensive loss of revenue if Defendant is allowed to lease space within Festival Plaza to a competing business.

    ©    That the threatened injury to the Plaintiff out-weighs the threat and harm the injunction may do to the respondent. The monetary loss to the Petitioners far exceeds any alleged loss to Defendant; and,

    (d)    Granting the preliminary injunction will not dis-serve the public interest.

(4)    There is a substantial likelihood that the Petitioner will prevail on the merits of this case. As proof thereof, Plaintiffs submit the following:

    (a)    Defendant has been put on notice of the fact that the opening of a competitive business will violate the Restrictions of Festival Plaza. (See Exhibit A, a letter from the developer of Festival Plaza, Mr. Joel D. McClinton, President of Festival Plaza, LLC, stating the same)

2

## CONCLUSION

In light of the foregoing, the Petitioner respectfully requests that this Court issue a temporary restraining order to immediately preserve the status quo before the impending opening of the competitive business and until such time as there is judicial review of the facts and merits of the claim can be determined. The Petitioner also requests that the Court set a hearing to determine if and when a preliminary and permanent injunctions are warranted under the facts of this case.

Respectfully submitted this 7th day of November, 2007.

Respectfully submitted,

OF COUNSEL:
McPhillips, Shinbaum, LLC
516 S. Perry Street  (36104)
P.O. Box 64
Montgomery, AL  36101-0064
Phone 334/262-1911
Facsimile 334/263-2321

_____
AARON J. LUCK (LUC014)

**Note:** This Memorandum is being served with the Original Complaint.

3

**LEASE AGREEMENT**

Arciterra Festival Montgomery AL, LLC an Arizona limited liability company ("Landlord") hereby leases to Nails Capital, LLC (the "Tenant") and Tenant hereby leases from Landlord the premises hereinafter described, on the terms and conditions as set forth in this Lease Agreement (hereinafter "Lease" on this *18* day of *Sept*, 2007 (the "Effective Date").

1.    **BASIC LEASE PROVISIONS**

The terms used as headings in this Section 1, if used elsewhere in the Lease, shall have the same meanings given to such terms in this Section 1.

    A.  **SHOPPING CENTER:** The property is depicted on the Site Plan attached hereto as Exhibit A, located in Montgomery, Alabama.

    B.  **PREMISES**: The area crosshatched on **Exhibit A**, commonly known as 8013 Vaughn Road, Montgomery, Alabama, containing approximately 1,472 square feet.

    C.  **COMMENCEMENT DATE:** The earlier of: (i)Sixty (60) days after the Effective Date, or (ii) the day Tenant opens for business.  From the Commencement Date, Tenant shall have One (1) month free base rent, where as Tenant will only be responsible for Additional Rent.

    D.  **TERM:**  Sixty-One (61) months, commencing on the first (1st) day of the first (1st) full calendar month following the Commencement Date, plus the period from the Commencement Date to the first (1st) day of the first (1st) full calendar month following the Commencement Date, unless the Commencement Date occurs on the first (1st) day of a calendar month, in which event said five (5) year period shall commence on the Commencement Date.  Tenant shall have the right to extend the Term of the Lease for one (1) additional consecutive term of five (5) years each subject to and in accordance with the terms and provisions of Section 29 of this Lease.

    E.  **MINIMUM RENT**: Lease Months 1-61:    $22.00 per square foot per annum
        OPTION 1:    Lease Months 62-120:  $24.00 per square foot per annum

    F.  **SECURITY DEPOSIT**:                $2,695.00

    G.  **PERCENTAGE RENT RATE**:           N/A

    H.  **LANDLORD'S ADDRESS FOR NOTICES**:

        Arciterra Festival Montgomery AL, LLC
        c/o ArciTerra Group, LLC
        2720 East Camelback Road
        Suite 220
        Phoenix, AZ  85016

1

**EXHIBIT**

*D*

I. <u>TENANT'S ADDRESS FOR NOTICES:</u>

Mr. and Mrs. Tu Nguyen
8755 Pole Ridge
Montgomery, AL 36117

J. <u>USE:</u>    Tenant shall use and occupy the Premises for the following purposes only ("Permitted Uses"), and for no other purpose whatsoever: nail salon and such other services that would be typically provided a nail salon that do not violate any exclusives with other tenants in the Shopping Center.

K. <u>TENANT'S TRADE NAME:</u>        Nail Capital

2.    <u>PREMISES.</u>

A. <u>Description of Premises.</u>  Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the Premises, subject and subordinate to all liens, encumbrances, easements, restrictions, covenants, zoning ordinances and any and all other governmental laws, rules, regulations and ordinances now or hereafter affecting or governing the Shopping Center. The Premises may be re-measured upon Tenant's request and at Tenant's expense by an Architect or appraiser reasonably acceptable to Landlord, provided that the Premises shall be measured from the exterior faces of all exterior walls, or to the center line of the common demising walls separating the Premises from other premises. Firewalls are considered exterior walls for the purpose of measurement of the Premises.

B. <u>Description of Common Areas.</u>  As used herein, the term "Common Areas" means the Shopping Center except for those portions of the building(s) therein occupied or intended to be occupied by tenants in the Shopping Center. Common Areas include all parking and other commonly used facilities in the Shopping Center including without limitation, all interior and exterior parking areas, roadways, walkways, sidewalks, aisles, service drives, driveways, loading areas and access ways, malls, hallways, toilet facilities, stairways, landscaping and curb cuts, within and/or serving the Shopping Center, and the exterior portion of the buildings in the Shopping Center.

3.    <u>USE AND STORE NAME.</u> Subject to and in accordance with all rules, ordinances, laws, regulations, statutes and requirements of all governmental authorities having jurisdiction thereof, the Premises are to be used by Tenant for the use set forth in Section 1 and for no other purpose and shall be operated under the Tenant's Trade Name and under no other trade name.

4.    <u>MINIMUM RENT; COMMENCEMENT DATE.</u>

A. <u>Payment of Minimum Rent.</u> Tenant agrees to pay to Landlord the Minimum Rent in advance, without deduction or offset, in lawful money of the United States of America and at such place as Landlord may from time to time designate, on or before the first day of each and every calendar month during the Term hereof and Landlord shall receive payment of minimum rent within seven (7) days of the first of the month, except that any required amount of prepaid Minimum Rent shall be paid upon the execution of this Lease. Rent for any period which is for less than one (1) month shall be a prorated portion of the monthly installment of Minimum Rent herein based upon the number of days in the calendar month during which such period occurs.

2

B. **Determination of Rent Commencement Date**. The Commencement Date for the payment of Minimum Rent shall be One (1) month from the Commencement Date set forth in Section 1.C of this Lease.

C. **Performance of Tenant's Work; Commencement of Business by Tenant**. Tenant may not commence construction of Tenant's Work without Landlord's prior written consent, which consent shall not be unreasonably withheld. Tenant shall commence the construction of Tenant's Work as described in Exhibit B promptly after receiving Landlord's consent, but in no event more than fifteen (15) days after receiving such consent, and shall diligently prosecute such construction to completion and shall open the Premises for business within ninety (90) days after the Effective Date.

5. **SECURITY DEPOSIT**. Concurrently with Tenant's execution of this Lease, Tenant shall deposit with Landlord the Security Deposit. Said sum shall be held by Landlord as security for the faithful performance by Tenant of all the terms, covenants, and conditions of this Lease to be kept and performed by Tenant during the Term hereof. If Tenant defaults with respect to any provision of this Lease, Landlord may (but shall not be required to) use, apply or retain all or any part of this Security Deposit for the payment of any rent or other sum in default, or for the payment of any amount which Landlord may spend or become obligated to spend by reason of Tenant's default, or to compensate Landlord for any other loss or damage which Landlord may suffer by reason of Tenant's default. If any portion of said Security Deposit is so used or applied Tenant shall, within five (5) days after written demand therefore, deposit cash with Landlord in an amount sufficient to restore the Security Deposit to its original amount and Tenant's failure to do so shall be a default under this Lease. Landlord shall not be required to keep the Security Deposit separate from its general funds, and Tenant shall not be entitled to interest on such deposit. If Tenant shall fully and faithfully perform each and every provision of this Lease to be performed by it, the Security Deposit or any balance thereof shall be returned to Tenant (or, at Landlord's option, to the last assignee of Tenant's interest hereunder) within thirty (30) days following expiration of the Lease. In the event of termination of Landlord's interest in this Lease, Landlord shall transfer said deposit to Landlord's successor in interest.

6. **ADDITIONAL CHARGES**.

A. **Percentage Rent.**

| | | |
|---|---|---|
| I. | **Calculation of Percentage Rent:** | N/A |
| II. | **Periodic Reporting and Payment:** | N/A |
| III. | **Annual Reporting and Payment:** | N/A |
| IV. | **Definition of "Gross Sales":** | N/A |
| V. | **Tenant's Books and Records:** | N/A |

B. **Adjustments.**

I. **Pro Rata Share**. In addition to the Minimum Rent, commencing on the Commencement Date, Tenant shall pay to Landlord its pro rata share (12.27%, as of the Effective Date), in accordance with the total leaseable floor area of the Premises as it relates to

the total leaseable floor area of the buildings within the Shopping Center which are from time to time completed as of the first day of each calendar quarter, of the items set forth in subparagraphs (a), (b) and (c) of this Section (herein called "Adjustments").

(a)    All taxes, assessments (special or otherwise), water and sewer rents and other governmental levies and charges of any and every kind, including the costs to Landlord of any appeals of any taxes or assessments attributable to the Shopping Center or any part thereof or any use thereof.

(b)    All costs and expenses of every kind and nature paid or incurred by Landlord or its designee in connection with the following:

i.    The operation, maintenance, management, repair and replacement of the Common Areas of the Shopping Center including without limitation, the landscaping, sweeping, rubbish removal, Common Area code and ordinance compliance costs, irrigation and storm water detention systems, snow removal, restriping, resurfacing, painting, utilities and all other services, costs and expenses for the maintenance and operation of the Common Areas as the Landlord determines from time to time are necessary and appropriate;

ii.    The operation, maintenance, management and repair of the Common Areas of the Shopping Center including, but not limited to the electricity, security, cleaning, periodic restaining, cleaning, painting and striping of, and removing debris from, the Common Areas, backflow prevention, and roofs of Landlord's Building; compacting and removing garbage and trash from the Shopping Center, maintaining and repairing fire protection systems, utility, sprinkler and security alarm systems, storm and sanitary drainage systems and other utility systems, gutters and downspouts, and the monitoring of the sprinkler system, Shopping Center signs (whether owned by Landlord or rented and whether or not located on the Shopping Center) and decorations on and off the Shopping Center Site, directional signs and markers, and on- and off-site traffic regulation and control signs and devices; and

iii.    The salaries and other compensation of security and other personnel who implement the aforesaid maintenance, security, operation, replacement, etc., of the Shopping Center and related costs including workmen's compensation insurance; and

iv.    The maintenance of all insurance carried by, and in the prudent discretion of Landlord or its mortgagee or lender covering the Shopping Center buildings and improvements, the Common Areas and every other facility or property used or required, or deemed necessary, in connection with any of them, including reasonable reserves for all of the foregoing.

(c)    An amount equal to fifteen percent (15%) of all Adjustments set forth in the foregoing subparagraphs (a) and (b) to cover Landlord's administrative and overhead costs.

(d)    Tenant's Common Area costs shall not increase by more than $1.00 per square foot from the current value estimated at $1.25, for the initial Lease Term. This provision does not include Tenant's Insurance and Tax Pro Rata Share.

II.    **Excluded Charges.** Notwithstanding anything to the contrary contained in Section 6.B.I. hereinabove, in the event that Landlord, in its reasonable and prudent discretion, determines at any time during the term of this Lease that it is more appropriate and/or equitable

4

that all or any portion of the charges set forth in Section 6.B.I, whether for existing or additional items includible in Adjustments as provided in said Paragraph, be chargeable exclusively to the tenants of a particular building in the Shopping Center or to a particular tenant or group of tenants in the Shopping Center such charges (the "Excluded Charges") shall be excluded in determining the aggregate amount of the Adjustments a pro rata share of which Tenant is obligated to pay as provided in said Section 6.B.I. In the event that the Excluded Charges are chargeable to Tenant, either by reason of the Premises being located in the particular building to which such Excluded Charges relate, or by reason of the fact that such Excluded Charges relate to Tenant or a group of tenants which includes Tenant, commencing with the first (1st) calendar month following the calendar month in which Landlord gives Tenant written notice of the amount of such Excluded Charges and Tenant's share thereof in accordance with Section 6.B.IV hereinbelow, Tenant shall be obligated to pay a share of such Excluded Charges calculated as follows:

(a)    If the Excluded Charges relate to the building in which the Premises are located, Tenant shall pay a pro rata share of such Excluded Charges in accordance with the total floor area of the Premises as it relates to the total leasable floor area of the building in which the Premises are located;

(b)    If the Excluded Charges relate to a group of tenants which includes Tenant, Tenant shall pay a pro rata share of such Excluded Charges in accordance with the total floor area of the Premises as it relates to the total leasable floor area of the premises (including the Premises) of all tenants comprising the group to which the Excluded Charges relate;

(c)    If the Excluded Charges relate solely to Tenant, Tenant shall pay the entire amount of the Excluded Charges; and

(d)    In the event that Tenant is obligated to pay all or any portion of any Excluded Charges in accordance with subparagraphs (a), (b) and/or (c), of this Section, Tenant shall pay to Landlord an amount equal to fifteen percent (15%) of all Excluded Charges payable by Tenant to cover Landlord's administrative and overhead costs.

III.    **Rent or Lease Taxes.** In addition to the foregoing, in the event that there is at any time during the term of this Lease a tax upon and/or measured by the rental payable by Tenant under this Lease, whether by way of a sales or use tax or otherwise, Tenant shall be solely responsible for the payment of such tax, provided, however that the foregoing shall not include any inheritance, estate, succession, transfer or gift tax imposed on Landlord or any income tax specifically payable by Landlord as a separate tax-paying entity without regard to Landlord's income source as arising from or out of the Shopping Center. Any such tax shall be paid by Tenant separately from the other taxes described in Paragraph 7.B.I and shall be paid monthly together with Tenant's monthly payments of Minimum Rent or as otherwise required by the taxing authority.

IV.    **Landlord's Statements of Adjustments.** Until such time as Landlord has furnished Tenant with Landlord's estimate of the anticipated monthly Adjustments for the period between the Commencement Date and the following January, Tenant shall pay an estimate of such monthly Adjustments as is determined by Landlord, in Landlord's reasonable discretion. Tenant shall continue to make said monthly payments until notified by Landlord in writing of a change in the amount of monthly Adjustments, whether based upon increased costs or upon additional work and/or services, in which event, commencing with the first (1st) calendar month following the calendar month in which Landlord gives Tenant written notice of the change in

5

monthly Adjustments, Tenant shall pay the amount set forth in the written notice to Tenant setting forth such change. At such time as Landlord may designate, Landlord shall endeavor to give Tenant a statement showing the total Adjustments for the prior calendar year and Tenant's pro rata share thereof, prorated from the commencement of rental. In the event the total of the monthly payments which Tenant has made for the prior calendar year are less than Tenant's actual share of such Adjustments, then Tenant shall pay the difference in a lump sum within thirty (30) days after receipt of such statement from Landlord and shall concurrently pay the difference in monthly payments in the then calendar year and the amount of monthly payments which are then calculated as monthly Adjustments. Any over-payment by Tenant shall be credited towards the monthly Adjustments next coming due. The actual Adjustments for the prior year shall be used for purposes of calculating the anticipated monthly Adjustments for then current year with actual determination of such Adjustments after each calendar year as above provided; excepting that in any year in which resurfacing is contemplated, Landlord shall be permitted to include the anticipated cost of same as part of the estimated monthly Adjustments. When the final determination is made of Tenant's share of said Adjustments for the year in which this Lease terminates, Tenant shall immediately pay any increase due over the estimated Adjustments previously paid and, conversely, any over-payment made shall be immediately refunded by Landlord to Tenant.

7.    **USES PROHIBITED.** Tenant shall not do, or permit anything to be done, in or about the Premises, nor bring or keep anything therein which is not within the permitted use of the Premises set forth in Section 1, which in any way will increase the existing rate of or affect any fire or other insurance upon the Shopping Center or any of its contents, or cause a cancellation of any insurance policy covering the Shopping Center or any part thereof or any of its contents, provided, however, that Tenant shall not be deemed to be in violation of the provisions of this Paragraph if Tenant pays any increase in the rates of casualty and/or liability insurance covering the Shopping Center attributable to Tenant's use and such use does not otherwise violate the provisions of this Paragraph. Tenant shall not do or permit anything to be done in or about the Premises which will in any way obstruct or interfere with the rights of other tenants or occupants of the Shopping Center or injure or annoy them or use or allow the Premises to be used for any unlawful purpose, nor shall Tenant cause, maintain or permit any nuisance in, on or about the Premises. Tenant shall not commit or allow to be committed any waste in or upon the Premises.

8.    **COMPLIANCE WITH LAW.** Tenant shall not use the Premises, or permit anything to be done in or about the Premises, or with respect to Tenant's signs or signage and any pylon or pole signs used by Tenant in the Shopping Center, which will in any way conflict with or violate any law, statute, ordinance or governmental rule or regulation now in force or which may hereafter be enacted or promulgated.

9.    **ALTERATIONS AND ADDITIONS.**

A. **Tenant's Alterations and Additions**. Tenant shall not make or allow to be made any alterations, additions or improvements to or of the Premises or any part thereof without first obtaining the written consent of Landlord. Except as otherwise provided below, any alterations, additions or improvements to or of said Premises, including, but not limited to, wall coverings, paneling and built-in cabinet work, but excepting movable furniture, equipment and other personal property, shall at once become a part of the realty and belong to Landlord and shall be surrendered with the Premises. In the event Landlord consents to the making of any alterations, additions or improvements to the Premises by Tenant, the same shall be made by Tenant at

6

Tenant's sole cost and expense. In making any such alterations, additions, or improvements, Tenant shall comply with the provisions of **Exhibit B** regarding Tenant's Work and shall use only contractors reasonably approved by Landlord in writing. In addition, if any of such alterations, additions or improvements in any way involve or require penetration of the roof of the Premises, such work shall be performed by Landlord's contractor, at Tenant's expense.

B. **Landlord's Alterations and Additions.** Notwithstanding anything else contained herein, Landlord may, from time to time, change the improvements in the Shopping Center by the construction, removal, relocation or alteration of any such improvements including, without limitation, enlargements of stores, additional space, including stores, office space, construction of parking facilities, and removal of and changes in any of the Common Areas, and entrances and exits to the Shopping Center. Landlord agrees that no such change of improvements shall reduce the aggregate capacity of the parking areas and other parking facilities of the Shopping Center below that then legally required by any governmental authority.

C. **Surrender of Premises.** Upon the expiration or sooner termination of the Term hereof, Tenant shall, upon written demand by Landlord, given prior to the end of the term, at Tenant's sole cost and expense, forthwith and with all due diligence, remove any and all alterations, additions, or improvements made by Tenant which are designated by Landlord to be removed, so that the Premises shall be surrendered upon expiration of the Lease in the condition delivered to Tenant upon substantial completion of Landlord's Work, together with such alterations, additions and improvements to the Premises as Landlord shall not have designated be removed upon termination of this Lease. Tenant shall, forthwith and with all due diligence, at its sole cost and expense, repair any damage to the Premises caused by such removal. In addition, upon expiration or sooner termination of the Term hereof, Tenant shall remove its exterior sign and repair, patch and repaint the parapet upon which such sign was erected.

10.    **REPAIRS AND MAINTENANCE.**

A. **Tenant's Repairs and Maintenance.** Subject to the provisions of Exhibit B, by entry hereunder, Tenant shall be deemed to have accepted the Premises as being in good, sanitary order, condition and repair. Tenant shall, at Tenant's sole cost and expense, keep the Premises and every part thereof including all signs in and about the Premises, in good condition and repair (except as hereinafter provided with respect to Landlord's obligations) including, without limitation, the maintenance, replacement and repair of any storefront, doors, door assemblies, window casements, glazing, plumbing, pipes, electrical wiring and, conduits, and heating and air conditioning system (the "HVAC system") servicing the Premises. Tenant shall obtain and keep in effect during the term of this Lease a service contract for repair and maintenance of the HVAC system, said maintenance contract to conform to the requirements under the warranty, if any, on said system. A duplicate copy of such contract and any amendments or renewals thereof shall be delivered to Landlord within five (5) days after Tenant first obtains such contract, renewal or amendments. Any damage to adjacent premises caused by Tenant's use of the Premises shall be repaired at the sole cost and expense of Tenant. If Tenant refuses or neglects to carry out any maintenance, repairs and replacements properly as required pursuant to this Paragraph 10.A. to the reasonable satisfaction of Landlord, Landlord may, but shall not be obligated to, upon thirty (30) days prior written notice, or such shorter notice as may be appropriate in an emergency, perform such maintenance, repairs and replacements without being liable for any loss or damage that may result to Tenant's merchandise, fixtures or other property or to Tenant's business by reason thereof, and upon completion thereof, Tenant shall pay to Landlord, upon demand, both Landlord's costs relating to any such maintenance, repairs

7

and replacements plus a sum equal to fifteen percent (15%) thereof representing Landlord's overhead.

      B. **Landlord's Repair and Maintenance.** Landlord shall repair and maintain the structural portions of the Shopping Center, including foundations, subfloor, structural roof deck, bearing walls and structural columns and beams of the buildings in the Shopping Center, except to the extent that such maintenance and repairs are caused by the act, neglect, fault or omission of any duty by Tenant, its agents, servants, employees, invitees, or any damage caused by breaking and entering, in which case, at Landlord's election, Tenant shall either repair such damage at Tenant's sole cost and expense or pay to Landlord the entire cost of such maintenance and repairs. In addition, Landlord shall repair and Tenant shall reimburse Landlord for all costs and expenses attributable to any repairs, maintenance and replacements caused by the willful act or negligence or other act or omission in violation of this Lease of Tenant, its agents, servants, employees or contractors.

    11.    **LIENS.** Tenant shall keep the Premises and the property in which the Premises are situated free from any liens arising out of any work performed, materials furnished or obligations incurred by or on behalf of Tenant. In the event any lien is filed against the Premises or the Shopping Center arising out of any work performed, materials furnished or obligations incurred by or on behalf of Tenant, Tenant shall, within ten (10) days after Landlord's written demand bond such lien and cause the Premises and Shopping Center to be released therefrom. Landlord may require, at Landlord's sole option, that Tenant provide to Landlord, at Tenant's sole cost and expense, a lien and completion bond in an amount equal to one and one-half (1-1/2) times the estimated cost of any improvements, additions or alterations in the Premises which Tenant desires to make, to protect Landlord against any liability for mechanics' and materialmen's liens and to insure completion of the work.

    12.    **ASSIGNMENT AND SUBLETTING.** Tenant may not assign this Lease, or any interest therein, and may not sublet the said Premises, or any right or privilege appurtenant thereto, or suffer any other person (the agents, employees and servants of Tenant excepted) to occupy or use the Premises, or any portion thereof, without the written consent of Landlord first had and obtained, and a consent to one assignment, subletting, occupation or use by any other person, shall not be deemed to be a consent to any subsequent assignment, subletting, occupation or use by another person. Landlord may withhold its consent for any sublease or assignment in Landlord's sole discretion. Any such assignment or subletting without such consent shall be void, and shall, at the option of Landlord, terminate this Lease. This Lease shall not, nor shall any interest therein, be assignable, as to the interest of Tenant, by operation of law, without the written consent of Landlord. Any such assignment shall be conducive upon Tenant remaining liable for the performance of all "Tenant" obligations hereunder. Landlord may freely assign this Lease where upon all of its obligations hereunder shall terminate. Notwithstanding anything herein to the contrary, Tenant shall remain liable for the tenant lease obligations hereunder in the event this Lease is assigned.

    13.    **INDEMNITY AND INSURANCE.**

      A. **Indemnity.** Tenant covenants to indemnify, protect, defend (with counsel reasonably acceptable to Landlord) and hold harmless Landlord and any person or persons in privity of estate with Landlord from and against any and all claims and demands of third persons (including, but not limited to, those for death, for personal injuries, or for loss of or damage to property) occurring in or arising, directly or indirectly, out of or in connection with the use and

8

occupancy of the Premises, any breach of this Lease, Tenant's Work or alterations performed by Tenant in or to the Premises, the business conducted in the Premises, or (without limiting the foregoing) as a result of any acts, omissions or negligence of Tenant, or any concessionaire, or their respective contractors, licensees, agents, servants, employees or other persons in or about the Premises, and from and against all costs, expenses and liability occurring in or in connection with any such claim or proceeding brought thereon, unless due to the gross negligence or willful misconduct of Landlord.

      B. **Tenant's Insurance**. From and after the date the Premises are made available to Tenant for Tenant's Work, Tenant shall be required to carry and maintain the following insurance:

      i.    **Liability Insurance**. Tenant shall obtain and maintain in full force and effect one or more policies of Commercial General Liability Insurance with limits of coverage of not less than $1,000,000.00 each occurrence, which coverage shall include commercial liability coverage, employer's liability coverage and, if Tenant serves or sells alcoholic beverages in or from the Premises, liquor liability coverage. In addition, Tenant shall maintain or cause to be maintained Worker's Compensation insurance with respect to all work done in and about the Premises as required by law. Tenant shall also maintain non-owned and hired automobile liability insurance with the same limits of coverage as the liability insurance Tenant is required to maintain pursuant to this Paragraph.

      ii.    **Casualty Insurance.** Tenant shall obtain and maintain in full force and effect during the term of this Lease one or more policies of Special Form Property Casualty Insurance, including coverage for fire, vandalism, malicious mischief and sprinkler leakage insurance (if there are any sprinklers in the Premises), on all movable trade fixtures, furniture and furnishings installed by Tenant in and about the Premises and all plate glass in the Premises. Such insurance shall be payable to Tenant and shall be in the amount equal to at least one hundred percent (100%) of the replacement cost thereof. Such policy or policies shall include Business Interruption insurance for direct or indirect loss of earnings attributable to all perils insured against under such Special Form Property Casualty Insurance.

      iii.    **Other Insurance.** Tenant shall also be required to obtain and maintain any other form of insurance and such higher limits as Landlord, acting reasonably, requires from time to time in form, in amounts and for insurance risks against which a prudent tenant would insure.

      iv.    **Policies**. Each policy required to be carried by Tenant hereunder shall be issued by an insurance carrier which is an "approved carrier" in the State in which the Shopping Center is located having a rating of A:X or better in Best's Insurance Guide, and shall contain a provision that it cannot be cancelled or amended insofar as it relates to the Premises, without at least thirty (30) days prior notice to Landlord. In addition, each such policy shall name Tenant, Landlord, Landlord's mortgagee(s), and/or Landlord's management agent, as insureds, as their interests may appear. A duplicate original of all policies procured by Tenant in compliance with its obligation under this Section shall be delivered to Landlord at least thirty (30) days prior to the commencement of Tenant's Work or otherwise upon demand by Landlord, and thereafter, at least thirty (30) days prior to the expiration of any such policy. In the event of Tenant's failure, in whole or in part, at any time during the Term hereof, to obtain insurance required to be carried by Tenant under the provisions hereof or to provide such evidence hereof in timely fashion, Landlord shall have the right (but shall not be obligated) to procure such insurance and Tenant shall pay to Landlord the costs and expenses thereof.

9

C. **Landlord's Insurance**. Landlord shall keep the Premises and the building of which they are a part insured against loss or damage by fire, with the usual extended coverage endorsements, in amounts equal to at least the replacement cost thereof above foundations and so as to prevent the application of co-insurance provisions. Such insurance shall cover improvements in the Premises owned by Landlord to the extent that the same are customarily insurable as part of the realty, but shall not include the cost of restoration of Tenant's movable trade fixtures, furniture, furnishings or decorative effects.

D. **Increase in Insurance Premiums.** The Tenant shall not keep, use, sell or offer for sale in or upon the Premises any article which may be prohibited by any fire insurance policy in force from time to time covering the Premises or the Shopping Center. If (a) the occupancy of the Premises; (b) the conduct of business in the Premises; (c) the use of any merchandise from or on the Premises (whether or not Landlord has consented to the use of such merchandise) or in any other portion of the Shopping Center where permitted by Landlord; or (d) any acts or omissions of Tenant in the Shopping Center or any part thereof, causes or results in any increase in premiums for the insurance carried from time to time by Landlord with respect to the Shopping Center, Tenant shall pay any such increase in premiums as additional rent forthwith after invoices for such additional premiums are rendered by Landlord. In determining whether increased premiums are caused by or result from the use or occupancy of the Premises, or the sale of any article therein or therefrom, a schedule issued by the organization computing the insurance rate on the Shopping Center showing the various components of such rate shall be conclusive evidence of the several items and charges which make up such rate.

E. **Risk**. Tenant agrees to use and occupy the Premises and to use all other portions of the Shopping Center which it is permitted to use by the terms of this Lease at its own risk, and hereby (for itself and all persons claiming under, by or through Tenant) releases Landlord, its agents, servants, contractors and employees, from all claims and demands of every kind resulting from any accident, damage, injury or breaking and entering occurring therein, unless due to Landlord's gross negligence or willful misconduct. Landlord shall have no responsibility or liability for any loss of, or damage or injury to, fixtures, improvements, Tenant's Work or other personal property of Tenant from any source whatsoever.

F. **Waiver of Subrogation**. Tenant hereby waives any rights it may have against Landlord to recover for loss or damage to property arising from a casualty insured or required to be insured against hereunder. In addition, all insurance policies carried by Tenant pursuant to this Paragraph 13, including but not limited to Broad Form Commercial Property insurance, shall expressly waive any right on the part of the Tenant's insurer against the Landlord for damage to or destruction of the Premises resulting from the acts, omissions or negligence of Landlord.

14. **UTILITIES.** Tenant shall pay for all water, gas, heat, light, power, sewer charges, telephone service and all other services and utilities which may from time to time be supplied to the Premises, together with any taxes thereon. If any such services are not separately metered to Tenant, Tenant shall pay a reasonable proportion, to be determined by Landlord, of all charges jointly metered with other Premises.

15. **PERSONAL PROPERTY TAXES.** Tenant shall pay, or cause to be paid, before delinquency, any and all taxes levied or assessed and which become payable during the term hereof upon all of Tenant's leasehold improvements, equipment, furniture, fixtures, and any other personal property located in the Premises. In the event any or all of Tenant's leasehold

10

improvements, equipment, furniture, fixtures and other personal property shall be assessed and taxed with the real property, Tenant shall pay to Landlord its share of such taxes within ten (10) days after delivery to Tenant by Landlord of a statement in writing setting forth the amount of such taxes applicable to Tenant's property.

16.  **RULES AND REGULATIONS**. Tenant shall faithfully observe and comply with the reasonable rules and regulations that Landlord shall from time to time promulgate and/or modify. The rules and regulations shall be binding upon Tenant upon delivery of a copy of them to Tenant. Landlord shall not be responsible to Tenant for the nonperformance of any of said rules and regulations by any other tenants or occupants.

17.  **HOLDING OVER.** If Tenant remains in possession of the Premises or any part thereof after the expiration of the Term hereof without the express written consent of Landlord, Tenant shall be liable to Landlord for any and all damages caused by Tenant's failure to vacate the Premises, including without limitation damages incurred in connection with any agreement by Landlord to lease or sell the Premises. During such unpermitted holdover, Tenant's Minimum Rent shall equal the amount of the last monthly Minimum Rent payable by Tenant hereunder plus an increase equal to fifty percent (50%) of such amount, plus all other charges payable hereunder, and subject to all other terms of this Lease. No such holding over by Tenant shall operate to extend the Term of this Lease.

18.  **ENTRY BY LANDLORD.** Landlord reserves, and shall at any and all times have upon forty-eight (48) hours prior notice (except in case of an emergency), the right to enter the Premises to inspect the same, to submit said Premises to prospective purchasers or tenants, to make repairs, without abatement of rent, and may for that purpose erect scaffolding and other necessary structures where reasonably required by the character of the work to be performed, always providing that the entrance to the Premises shall not be unreasonably blocked thereby, and further providing that the business of Tenant shall not be interfered with unreasonably.

19.  **TENANT'S DEFAULT**. The occurrence of any one or more of the following events shall constitute a default and breach of this Lease by Tenant:

A.  **Monetary Default.** The failure by Tenant to make any payment of rent or any other payment required to be made by Tenant hereunder, as and when due, where such failure shall continue for a period of seven (7) days after notice thereof by Landlord to Tenant.

B.  **Transfer Without Landlord's Consent.** The occurrence of a purported transfer of any right, title or interest of Tenant's interest in the Lease or the Premises without Landlord's prior written consent.

C.  **Non-Monetary Default.** The failure by Tenant to observe or perform any of the covenants, conditions or provisions of this Lease to be observed or performed by Tenant, where such failure shall continue for a period of thirty (30) days after written notice thereof by Landlord to Tenant; provided, however, that if the nature of Tenant's default is such that more than thirty (30) days are reasonably required for its cure, then Tenant shall not be deemed to be in default if Tenant commences such cure within said thirty (30) day period and thereafter diligently prosecutes such cure to completion.

11

D. **Habitual Monetary Default**. The failure by Tenant to make any payment of rent or any other payment required to be made by Tenant hereunder, as and when due, on more than two (2) occasions during any consecutive period of twelve (12) months during the term of the Lease.

E. **Bankruptcy**. The making by Tenant of any general assignment or general arrangement for the benefit of creditors; or the filing by or against Tenant of a petition to have Tenant adjudged a bankrupt, or a petition or reorganization or arrangement under any law relating to bankruptcy (unless, in the case of a petition filed against Tenant, the same is dismissed within sixty [60] days); or the appointment of a trustee or a receiver to take possession of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease, where possession is not restored to Tenant within thirty (30) days; or the attachment, execution or other judicial seizure of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease, where such seizure is not discharged within thirty (30) days.

20.    **REMEDIES IN DEFAULT.**

A. **Landlord's Remedies.** In the event of any default or breach by Tenant, Landlord may at any time thereafter, in its sole discretion, with or without notice or demand and without limiting Landlord in the exercise of a right or remedy which Landlord may have by reason of such default or breach:

I. Terminate Tenant's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Tenant shall immediately surrender possession of the Premises to Landlord. In such event Landlord shall be entitled to recover from Tenant all damages incurred by Landlord by reason of Tenant's default including, but not limited to, the cost of recovering possession of the Premises; expenses of reletting, including necessary renovation and alteration of the Premises; reasonable attorney's fees; amount of the unpaid rent and other charges and Adjustments called for herein for the balance of the term; and that portion of any leasing commission paid by Landlord and applicable to the unexpired term of this Lease. Unpaid installments of rent or other sums shall bear interest from the date due at the maximum legal rate; or

II. Maintain Tenant's right to possession, in which case this Lease shall continue in effect whether or not Tenant shall have abandoned the Premises. In such event Landlord shall be entitled to enforce all of Landlord's rights and remedies under this Lease, including the right to recover the rent and any other charges and Adjustments as may become due hereunder. Neither efforts by Landlord to mitigate damages caused by a default by Tenant nor the acceptance of any rentals shall constitute a waiver by Landlord of any of Landlord's rights or remedies.

III. Pursue any other remedy now or hereafter available to Landlord under the laws or judicial decisions of the State in which the Premises are located.

B. **Landlord's Right to Cure.** In the event of any breach of this Lease by Tenant, Landlord may (but shall not be obligated to) at any time, after ten (10) days' written notice, cure such breach for the account and at the expense of Tenant. If Landlord at any time so elects or is compelled by any other person to cure such breach or is compelled to incur any other expense arising out of such breach by Tenant (including without limitation, reasonable attorneys' fees and disbursements in instituting, prosecuting or defending any suits, actions or proceedings to enforce Landlord's rights under this or any other Paragraph of this Lease or otherwise) the sum

12

or sums so paid by Landlord, with all interest, costs and damages, shall be paid by Tenant to Landlord within thirty (30) days following written demand. Such expenses may be recovered in the same action or proceeding forming the basis of default.

C. **Additional Rent.** All amounts which Tenant is required to pay hereunder and all damages, costs and expenses which Landlord may incur by reason of any default by Tenant of any of the terms and provisions of this Lease shall be deemed to be additional rent hereunder ("Additional Rent"). Additional Rent shall accrue commencing on the Commencement Date. In the event of nonpayment by Tenant of any Additional Rent, Landlord shall have all the rights and remedies with respect thereto as Landlord has for nonpayment of Minimum Rent. As used in this Lease, the term "rent" or "rentals" shall be defined as both "Minimum Rent" and "Additional Rent". All rentals and other monies due under this Lease shall survive the expiration or earlier termination of this Lease. All rentals shall be paid in lawful money of the United States to Landlord at the address herein specified for purposes of notices, or to such other persons at such other places as may be designated in writing from time to time by Landlord.

21.    **RECONSTRUCTION.**

A. **Destruction of the Premises.** If the Premises are at any time destroyed or damaged (including, without limitation, smoke and water damage) as a result of fire, the elements, accident or other casualty required to be insured against by Landlord or otherwise insured against by Landlord and not caused by Tenant, and if as a result of such occurrence:

II. The Premises are rendered untenantable only in part, this Lease shall continue in full force and effect and Landlord shall, subject to this Section 21, commence diligently to reconstruct, rebuild or repair the Premises to the extent only of Landlord's standard vanilla shell condition described in Exhibit B as Landlord's Work, and exclusive of Tenant's Work as therein set out, and only Minimum Rent (but not Adjustments or Percentage Rent) shall abate proportionately to the portion of the Premises rendered untenantable from the date of the destruction or damage and until the Premises have been restored and rendered tenantable by Landlord to the condition hereinabove described;

III. The Premises are rendered wholly untenantable, Landlord shall, subject to Subsection C hereof, commence diligently to reconstruct, rebuild or repair the Premises to the extent of Landlord's standard vanilla shell condition described in Exhibit B as Landlord's Work, and only Minimum Rent (but not Adjustments or Percentage Rent) shall abate entirely from the date of the destruction or damage and until the Premises have been restored and rendered tenantable by Landlord to the condition hereinabove described:

B. **Uninsured Casualty.** In the event the Premises are damaged as a result of any cause other than the perils covered by fire and extended coverage insurance, then Landlord shall forthwith repair the same, provided the extent of the destruction is less than ten percent (10%) of the then full replacement cost of the Premises. In the event the destruction of the Premises is to an extent of ten percent (10%) or more of the full replacement cost then Landlord shall have the option; (1) to repair or restore such damage, this Lease continuing in full force and effect, but the Minimum Rent to be proportionately reduced as hereinabove in this Paragraph provided; or (2) give notice to Tenant at any time within sixty (60) days after such damage, terminating this Lease as of the date specified in such notice, which date shall be not more than thirty (30) days after the giving of such notice. In the event Landlord gives such notice, this Lease shall expire and all interest of Tenant in the Premises shall terminate on the date so specified in such notice and the Minimum Rent, reduced by a proportionate reduction based upon the extent, if any, to

13

which such damage interfered with the business carried on by Tenant in the Premises, shall be paid up to the date of said termination.

C. **Damage to Shopping Center**. If more than twenty-five percent (25%) of the Shopping Center is damaged by fire or other cause, notwithstanding whether the Premises may be affected or unaffected by such fire or other casualty, Landlord shall have the right, to be exercised by notice in writing to Tenant within sixty (60) days from and after such occurrence, to elect to cancel and terminate this Lease. Upon the giving of such notice to Tenant, the term of this Lease shall expire by lapse of time upon the third (3rd) day after such notice is given and Tenant shall thereupon vacate the Premises and surrender the same to Landlord.

D. **Damage to Tenant's Property.** Landlord shall not be required to repair any injury or damage by fire or other cause, or to make any repairs or replacements of any leasehold improvements, fixtures, or other personal property of Tenant.

22.    **EMINENT DOMAIN**. If more than twenty five percent (25%) of the Premises shall be taken or appropriated by any public or quasi-public authority under the power of eminent domain, either party hereto shall have the right, at its option, within sixty (60) days after said taking, to terminate this Lease upon thirty (30) days written notice. If either less than or more than twenty five percent (25%) of the Premises are taken (and neither party elects to terminate as herein provided), the Minimum Rent thereafter to be paid shall be equitably reduced. If twenty five percent (25%) or more of the Shopping Center other than the Premises may be so taken or appropriated, Landlord shall within sixty (60) days of said taking have the right at its option to terminate this Lease upon written notice to Tenant. In the event of any taking or appropriation whatsoever, Landlord shall be entitled to any and all awards and/or settlements which may be given and Tenant shall have no claim against Landlord for the value of any unexpired term of this Lease.

23.    **COMMON AREAS: PARKING**. Landlord covenants that the Common Areas of the Shopping Center, as they exist from time to time during the term of this Lease, shall be available for the non-exclusive use of Tenant during the full term of this Lease or any extension of the term hereof, provided that the condemnation or other taking by any public authority, or sale in lieu of condemnation, of any or all of such Common Areas shall not constitute a violation of this covenant. Tenant understands and acknowledges that any portion or portions of the Shopping Center on which no buildings are erected as of the Commencement Date shall be part of the Common Areas of the Shopping Center until such time as buildings are erected thereon. Notwithstanding the foregoing, Landlord shall have the right to close, if necessary, all or any portion of the Common Areas to such extent as may in the opinion of Landlord's counsel be reasonably necessary to prevent a dedication thereof or the accrual of any rights of any person or the public therein; to close temporarily all or any portion of the Common Areas to discourage non-customer use; to use portions of the Common Areas while engaged in making additional improvements or repairs or alterations to the Shopping Center, to transfer, in whole or in part, any of Landlord's rights or obligations under this Paragraph to any other tenant(s), subtenant(s) or other occupants of the Shopping Center, or to such other party(ies) or designee(s) as Landlord may from time to time determine; and to do and perform such other act (whether similar or dissimilar to the foregoing) in, to and with respect to, the common areas as in the use of good business judgment Landlord shall conclusively determine to be appropriate for the Shopping Center. In addition, Landlord reserves the right to change the entrances, exits, parking areas(s), traffic lanes and the boundaries and locations of such, provided however, that anything herein to the contrary notwithstanding, said parking area or areas shall at all times be at least equal to the

then parking for the Shopping Center legally required by governmental authorities.

     A. **Maintenance of Common Areas**. Landlord shall keep the Common Areas in a neat, clean and orderly condition and shall repair any damage to the facilities thereof.

     B **Employee Parking.** Tenant acknowledges that Landlord reserves the right to establish nonexclusive employee parking area in the Shopping Center. In such event, Tenant shall cause Tenant's employees to park within such area.

     C. **Rules and Regulations**. Tenant, in the use of said Common Areas, agrees to comply with such reasonable rules, regulations and charges for parking as Landlord may adopt from time to time for the orderly and proper operation of said Common Areas. Tenant understands and agrees that Landlord shall have the right to adopt special rules and regulations which apply only to tenants who conduct particular uses in their premises. Such rules may include but shall not be limited to the following: (1) the restricting of parking to a limited, designated area or areas or the prohibition of employee parking within the Shopping Center, and (2) the regulation of the removal, storage and disposal of Tenant's refuse and other rubbish.

24.    **SIGNS.**

     A. **Window Signs**. Tenant may affix and maintain upon the interior glass panes and supports of the show windows of the Premises only such signs, advertising placards, names, insignia, trademarks and descriptive material that advertise or promote tenants business.

     B. **Exterior Sign.** Tenant shall erect one (1) sign on the front of the Premises, not later than the date Tenant opens for business, in accordance with the sign criteria which has been established by Landlord, attached herewith as **Exhibit C**. Landlord hereby approves the Tenant's exterior sign specifications set forth on **Exhibit C-1** attached hereto, and Tenant agrees that Tenant's exterior sign shall be installed in accordance with such specifications. With respect to any desired modification or replacement of Tenant's exterior sign, Tenant shall submit to Landlord, prior to installation of the sign, a detailed sign drawing complying with the requirements of **Exhibit C** attached hereto, for approval by Landlord. Notwithstanding the foregoing, all signs of Tenant shall be required to comply with all applicable governmental requirements and Tenant shall obtain all applicable governmental permits prior to installing any signage. Tenant shall pay for all costs in connection with such sign and shall be responsible for the cost of proper installation and removal thereof and any damage caused to the Shopping Center and/or Premises thereby. In the event Landlord deems it necessary to remove such sign, then Landlord shall have the right to do so. No additional signs which can be seen from the exterior of the Premises, shall be installed or displayed in, on or about the Premises without the prior written consent of Landlord, which shall not be unreasonably withheld, conditioned or delayed. Any sign or display visible form the exterior of the Premises which does not meet the above criteria may be removed at any time by Landlord without incurring any liability thereof. Should Landlord construct a pylon or monument sign for the Shopping Center and make panels available to tenants leasing the same or less square footage than Tenant, Landlord agrees that Tenant shall have the right to install and maintain a panel on said pylon or monument sign. If Tenant installs a panel on a pylon or monument sign, Tenant agrees that it shall pay all costs for the fabrication and installation of its panel and for its pro-rata share of all costs incurred by Landlord in constructing, operating and maintain the pylon or monument sign.

25.    **USE AND OPERATION.**

A.  **Covenant of Continuous Operation**. Tenant covenants that, subject to all of the terms, covenants and conditions of this Lease, it will use, occupy and operate the entire Premises continuously and without interruption during the Term in the manner and under Tenant's Trade Name and in a competent, dignified, energetic and consistent manner therewith as will enhance the Shopping Center as a whole and its reputation as a desirable place to shop and as will achieve the maximum volume of sale.

B.  **Hours of Operation**. Tenant agrees that during the Term it will (i) be open for business and fully stocked not less than the following days and hours: Monday through Saturday 10:00 a.m. to 5:30 p.m.; excluding holidays; (ii) adequately staff its store with sufficient employees and carry sufficient stock of such size, character and quality to handle the maximum business; (iii) maintain displays of merchandise in and keep the display windows in the Premises well lighted; and (iv) store in the Premises only such merchandise as will be offered for sale at retail in the Premises within a reasonable time.

C.  **Violation of Covenant of Continuous Operation**. In the event that Tenant fails to take possession of the Premises and to open for business fully fixturized, stocked and staffed on or before the date which is thirty (30) days after the Commencement Date, or after opening the Premises for business, Tenant thereafter closes same to the public, then Landlord shall, in addition to any and all remedies herein provided, have the right at its option to collect not only the Minimum Rent, but as Additional Rent, payable together with installments of Minimum Rent which commence on the Commencement Date, a sum equal to the Minimum Rent per day for each and every day after the Commencement Date that Tenant shall fail to open the Premises and commence to do business or after having commenced to do business, for each and every day that the Premises are closed in violation of this Section. The payments provided for in this Section shall be deemed to be liquidated damages and not a penalty.

26.    **HAZARDOUS MATERIAL.**

A.  **Hazardous Material Defined**. To Landlord's actual knowledge no tenant of the Shopping Center uses or stores Hazardous Materials on the Premises except those substances used by tenants of the Shopping Center in the ordinary course of their respective businesses and except in compliance with all environmental laws. As used in this Lease, the term "Hazardous Material" means any flammable items, explosives, radioactive materials, hazardous or toxic substances, material or waste or related materials, including any substances defined as or included in the definition of "hazardous substances", "hazardous wastes", "infectious wastes", "hazardous materials" or "toxic substances" now or subsequently regulated under any applicable federal, state or local laws or regulations, including, without limitation, oil, petroleum-based products, paints, solvents, lead, cyanide, DDT, printing inks, acids, pesticides, ammonia compounds and other chemical products, asbestos, PCBs and similar compounds, and including any different products and materials which are subsequently found to have adverse effects on the environment or the health and safety of persons.

B.  **Consent Required.** Tenant shall not cause or permit any Hazardous Material to be generated, produced, brought upon, used or disposed of in or about the Premises or the Shopping Center by Tenant, its agents, employees, contractors, sublessees or invitees without the prior written consent of Landlord. If Landlord provides written consent to the generation, production, use or disposal of Hazardous Material in or about the Premises by Tenant, its agents,

employees, contractors, sublessees or invitees, then, in addition to any other requirements or conditions that Landlord may impose in connection with such consent, (a) Tenant promptly shall deliver to Landlord copies of all permits, approvals, filings and reports reflecting the legal and proper generation, production, use, storage, treatment or disposal of all Hazardous Material generated, used, stored, treated or removed from the Premises and the Shopping Center and, upon Landlord's request, copies of all hazardous waste manifests relating thereto, and (b) upon the expiration or earlier termination of this Lease, Tenant shall cause all Hazardous Material introduced by Tenant or its agents, employees, contractors sublessees, invitees, or assigns, or arising out of Tenant's use of the Premises or Tenant's performance of any work therein, to be removed from the Premises and the Shopping Center and transported for use, storage or disposal in accordance with all applicable laws, regulations and ordinances and Tenant shall provide Landlord with evidence reasonably satisfactory to Landlord of the same.

C. **Removal of Hazardous Material and Notice**. In the event that Hazardous Material is discovered upon, in or under the Premises and the applicable governmental agency requires the removal of such Hazardous Material, Tenant shall be responsible for removing the Hazardous Material introduced by Tenant or its agents, employees, contractors, sublessees, or assigns, or arising out of Tenant's conduct of its business in the Premises or Tenant's performance of any work therein. Notwithstanding the foregoing, Tenant shall not take any remedial action in or about the Premises or the Shopping Center, not enter into any settlement with respect to any claims relating to any Hazardous Material in any way connected with the Premises or the Shopping Center without first notifying Landlord of Tenant's intention to do so and affording Landlord the opportunity to appear, intervene or otherwise appropriately assert and protect Landlord's interest with respect thereto. Tenant shall immediately notify Landlord in writing of: (a) any spill, release, discharge or disposal of any Hazardous Material in, on or under the Shopping Center or any portion thereof, (b) any enforcement, cleanup, removal or other governmental or regulatory action instituted, completed or threatened pursuant to any laws, regulations or ordinances relating to Hazardous Material; (c) any claim made or threatened by any person against Tenant or the Shopping Center relating to damage resulting from or claimed to result from any Hazardous Material; and (d) any reports made to any environmental agency arising out of or in connection with any Hazardous Material in, on or removed from the Shopping Center, including any complaints, notices, warnings, reports or asserted violations in connection therewith. Tenant shall also supply to Landlord promptly as possible, and in any event within five (5) business days after Tenant first receives or sends the same, copies of all claims, reports, complaints, notices, warnings or asserted violations relating in any way to the Shopping Center or Tenant's use thereof.

D. **Survival of Provisions**. The respective rights and obligations of Landlord and Tenant under this Section 26 shall survive the expiration or earlier termination of this Lease.

27.     **GENERAL PROVISIONS.**

A. **Late Charges.** Tenant hereby acknowledges that late payment by Tenant to Landlord of rent or other sums due hereunder will cause Landlord to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed upon Landlord by the terms of any mortgage or trust deed covering the Premises. Accordingly, if any installment of rent or any sum due from Tenant shall not be received by Landlord or Landlord's designee within ten (10) days after said amount is past due, then Tenant shall pay to Landlord a late charge equal to twenty percent (20%) of such overdue

17

amount (but in no event greater than the maximum amount permitted by law), plus any attorneys' fees incurred by Landlord by reason of Tenant's failure to pay rent and/or other charges when due hereunder. The parties hereby agree that such late charges represent a fair and reasonable estimate of the cost that Landlord will incur by reason of the late payment by Tenant. Acceptance of such late charges by Landlord shall in no event constitute a waiver of Tenant's default with respect to such overdue amount, nor prevent Landlord from exercising any of the other rights and remedies granted hereunder.

B. **Force Majeure.** Landlord and Tenant agree that if either party shall be delayed in, or prevented from, the performance of any act required hereunder by reason of acts of God, strikes, lockouts, labor troubles, inability to procure materials, restrictive governmental laws or regulations or other causes without fault and beyond the control of the party obligated (financial inability excepted), performance of such act shall be excused for the period of the delay; provided, however, nothing herein contained shall excuse Tenant from prompt payment of Minimum Rent, Adjustments or other charges required of Tenant hereunder except as may be expressly provided elsewhere in this Lease.

C. **Partial Invalidity.** Any provisions of this Lease which shall prove to be invalid, void, or illegal shall in no way affect, impair or invalidate any other provisions hereof and such other provisions shall remain in full force and effect.

D. **Choice of Law.** This Lease shall be governed by the laws of the state in which the Premises are located.

E. **Attorneys' Fees.** In the event of any action or proceeding brought by either party against the other under this Lease, the prevailing party shall be entitled to recover for the fees of its attorneys in such action or proceeding. Tenant shall also indemnify, protect, defend and hold Landlord harmless from all costs and expenses Landlord may incur if Landlord becomes, or is made a party to, any claim or action (a) instituted by Tenant against any third party, or by any third party against Tenant; (b) for foreclosure of any lien for labor or material allegedly furnished to or for Tenant; or (c) otherwise arising out of or resulting from any act or transaction of Tenant. Tenant shall defend Landlord against any such claim or action at Tenant's expense with counsel reasonably acceptable to Landlord or, at Landlord's election, Tenant shall reimburse Landlord for all legal fees or costs Landlord reasonably incurs in any such claim or action.

F. **Sale of Premises by Landlord.** In the event of any sale of the Premises by Landlord, Landlord shall be and is hereby entirely freed and relieved of all liability under any and all of its covenants and obligations contained in or derived from this Lease arising out of any act, occurrence or omission occurring after the consummation of such sale; and the purchaser, at such sale or any subsequent sale of the Premises shall be deemed, without any further agreement between the parties or their successors in interest or between the parties and any such purchaser, to have assumed and agreed to carry out any and all of the covenants and obligations of Landlord under this Lease.

G. **Subordination; Attornment**. This Lease shall be subject and subordinate to the lien of any mortgages or deeds of trust in any amount or amounts whatsoever now or hereafter placed on or against or affecting the Shopping Center or any part thereof, without the necessity of the execution and delivery of any further instruments on the part of Tenant. Upon request of Landlord, Tenant will in writing subordinate its rights hereunder to the lien of any mortgage or deed of trust, now or hereafter in force against the Premises. In the event any proceedings are

brought for foreclosure, or in the event of the exercise of the power of sale under any mortgage or deed of trust made by Landlord covering the Premises, Tenant shall attorn to the purchaser upon any such foreclosure or sale and recognize such purchaser as Landlord under this Lease provided any such mortgagee agrees not to disturb Tenant's possession of the Premises so long as Tenant is not in default of any of the terms and provisions of this Lease. Notwithstanding the above, if any mortgagee or beneficiary shall elect to have this Lease prior to the lien of its mortgage or deed of trust, and shall give written notice thereof to Tenant, this Lease shall be deemed prior to such mortgage or deed of trust, whether this Lease is dated prior or subsequent to the date of such mortgage or deed of trust, or the date of the recording thereof. In no event shall this Lease, or any of Landlord's rights and remedies hereunder, be subject or subordinate to any Lien, chattel mortgage or other encumbrance against Tenant's interest in the leasehold created by this lease or encumbering any property of Tenant located in or about the Premises, it being expressly understood and agreed nothing contained in this Lease shall expressly or implied obligate Landlord to subordinate or waive any of Landlord's rights under this Lease or under the laws of the jurisdiction in which the Shopping Center is located.

H. **Notices.** All notices and demands which may or are to be required or permitted to be given by either party to the other hereunder shall be in writing. All notices and demands shall be sent by United States Mail, postage prepaid, certified/return receipt, or by Federal Express, Express Mail or other generally recognized carrier of expedited delivery, if by Landlord to Tenant addressed to Tenant at the Premises, and the address set forth in Section 1 above, or to such other place as Tenant may from time to time designate in a notice to Landlord and if by Tenant to Landlord addressed to Landlord at the address set forth in Section 1 above or to such other person or place as Landlord may from time to time designate in a notice to Tenant. Any such notice shall be deemed given on the date indicated on the receipt or refusal of receipt of the carrier that delivery has been made or refused at the address as provided herein.

I. **Estoppel Certificate/Tenant's Statement**. Tenant shall at any time and from time to time, upon not less than ten (10) days prior written notice from Landlord, execute, acknowledge and deliver to Landlord, Landlord's proposed mortgagee, or purchaser, a statement in writing and/or certificate in recordable form (a) certifying that this Lease is unmodified and in full force and effect (or, if modified, stating the nature of such modification and certifying that this Lease as so modified is in full force and effect), and the date to which the rental and other charges are paid in advance, if any, (b) acknowledging that there are not, to Tenant's knowledge, any uncured defaults on the part of Landlord hereunder, or specifying such defaults if any are claimed, (c) setting forth the date of commencement of rents and expiration of the term hereof, and (d) any other matters which such mortgagee or purchaser requires. In the event Tenant should refuse to execute and deliver said statement and/or certificate, Landlord shall have the right to charge a fee equal to 5% of the Minimum Rent for each week that passes from the date of such refusal or; cancel this Lease by giving Tenant an additional ten (10) days notice in writing whereupon, this Lease shall be of no further force and effect.

J. **Limitation of Right of Recovery Against Landlord**. Tenant acknowledges and agrees that the liability of Landlord under this Lease shall be limited to its interest in the Shopping Center and any judgments rendered against Landlord shall be satisfied solely out of the proceeds of sale of its interest in the Shopping Center. No personal judgment shall lie against Landlord upon extinguishment of its rights in the Shopping Center and any judgment so rendered shall not give rise to any right of execution or levy against Landlord's assets. The provisions hereof shall inure to Landlord's successors and assigns including any mortgagee.

19

K. **Interest**. Any payment due from Tenant to Landlord, shall bear interest from the date due until paid, at an annual rate equal to the greater of: (i) twelve percent (12%); or (ii) eight percent (8%) plus the Prime Rate established from time to time of Wachovia Bank, N.A.; provided, however, in no event shall the interest rate exceed the maximum rate of interest proscribed by law.

28.    **BROKERS**. Tenant and Landlord each warrant and represent to the other that there was no broker or agent instrumental in consummating this Lease other than Tenant's broker, Coldwell Banker Commercial Moore Company Realty. Tenant and Landlord each agree to indemnify and hold the other harmless against any claims for brokerage or other commission arising by reason of a breach by the indemnifying party of this representation and warranty. JC Holdings, Inc. shall be responsible for the payment of a broker's fee to Broker, which payment shall be pursuant to the terms and conditions of a separate written agreement between Landlord and Broker.

29.    **EXCLUSIVE.**    Landlord agrees that Landlord will not permit any individual, partnership or corporation ("Competing Business") other than Tenant which engages in any activities similar to Tenant's (including nail salon), to lease or occupy the Premises or any other space in the same structure in which the Premises are located and owned by Landlord, during the term of the Lease.

30.    **OPTION TO EXTEND TERM.** Provided: (i) Tenant is not in default under any of the terms or provisions of the Lease at the time Tenant exercises such option and Tenant is not in default under any of the terms and provisions of the Lease on the first day of the extended term, (ii) Tenant has not been late in the payment of rentals under the Lease more than two (2) times during any period of twelve (12) consecutive months during the initial Term of the Lease, and (iii) Tenant herein has not assigned, subleased or otherwise transferred Tenant's interest in the Lease, Tenant shall have the right to extend the Term of the Lease for **one (1)** additional consecutive term of **five (5)** years in accordance with the following:

I.    Tenant shall exercise such right to extend by written notice to Landlord, not less than six (6) months nor more than twelve (12) months prior to the expiration of the then current term.

II.    The extended term shall be subject to the same terms, covenants and conditions as the original term of the Lease, except that the Minimum Rent shall be increased as of the first (1st) day of the extended term as stated in Section 1.

SIGNATURES FOLLOW

20

IN WITNESS WHEREOF, the parties have executed this Lease as of the day and year first above.

LANDLORD:

**ARCITERRA FESTIVAL MONTGOMERY AL, LLC**
      **an Arizona limited liability company**

By: _____
Jonathan M. Larmore
Manager
Date: _____9/19/07_____

TENANT:

**NAIL CAPITAL, LLC**

By: _____
Name: _____LISA   KNGUYEN_____
Title: _____
Date: _____Sept / 18 / 2007_____

**EXHIBIT A**

**Site Plan**



**EXHIBIT B**

**Description of Landlord and Tenant Work**

None. Tenant accepts the Premises in "As-Is" condition. Date of Substantial Completion shall be sixty (60) days following the Effective Date.

In no event shall Landlord be obligated to complete or otherwise provide any of the tenant finish work for the Premises ("Tenant Finish Work"). Tenant shall have the right to choose any licensed, bonded and insured contractor to perform all Tenant Finish Work; provided, however, that Landlord shall have approved the contractor in writing, which approval shall not be reasonably withheld. All plans, drawings and specifications for the Tenant Finish Work shall be approved in writing by Landlord prior to the commencement of the Tenant Finish Work; provided, however, that any denial of such approval must be made in writing by Landlord within fifteen (15) days following the submission to Landlord of all such plans, drawings and specifications, or else such approval shall be deemed to have been given. Upon completion of all Tenant Finish Work, Tenant shall submit to Landlord a written invoice accompanied by waivers of all contractors' and subcontractors' mechanics' and materialmen's liens. In completing the Tenant Finish Work, Tenant shall (i) indemnify, defend and hold Landlord harmless from any loss, damage, expense or claim arising from the installation, construction and completion of the Tenant Finish Work, and (ii) be subject to the provisions of the Section below, Mechanic's Liens, of this Exhibit B.

Mechanic's Liens. No work performed by Tenant pursuant to this Amendment, whether in the nature of erection, construction, alteration or repair, shall be deemed to be for the immediate use and benefit of Landlord so that no mechanic's or other lien shall be allowed against the estate of Landlord by reason of any consent given by Landlord to Tenant to improve the Premises. Tenant shall pay promptly all persons furnishing labor or materials with respect to any work performed by Tenant or its contractor or subcontractors on or about the Premises. In the event any mechanic's or other lien shall at any time be filed against the Premises by reason of work, labor, services or materials performed or furnished, or alleged to have been performed or furnished, to Tenant or to anyone holding the Premises through or under Tenant, Tenant shall forthwith cause the same to be discharged of record or bonded to the satisfaction of Landlord. If Tenant shall fail to cause such lien forthwith to be so discharged or bonded after being notified of the filing thereof, than, in addition to any other right or remedy of Landlord, Landlord may bond or discharge the same by paying the amount claimed to be due, and the amount so paid by Landlord including reasonable attorney's fees incurred by Landlord either defending against such lien or in procuring the discharge of such lien, together with interest thereon at the Default Rate, shall be due and payable immediately by Tenant to Landlord as Additional Rental.

**EXHIBIT C**

**Sign Criteria**

**SIGN SPECIFICATIONS & REQUIREMENTS**

The intent of the owners and the management is to create a graphic environment that is individual and distinctive in identity for the merchant and also compatible with other signs within the Shopping Center. The total concept should give an impression of quality, professionalism and instill a good business image.

The following specifications are to be used for design in your sign; however, in all cases final written approval is required by Landlord prior to manufacturing and installing all signs, including any sign inside that may be visible from the outside.

I.    **CATEGORIES OF SIGNS**

      A.     Attached Signs (signage attached to buildings)
             1. Major Merchants
             2. In-Line Merchants
             3. Outparcels

      B.     Ground Signs

      C.     Temporary or Directional Signs

      D.     Window Signs

II.    **APPROVAL**

All designs for Merchant signs, and all other signage described in this manual shall be reviewed and approved by the Landlord and the City of Montgomery prior to fabrication and installation. Shop drawings shall be submitted to the Landlord for approval indicating the below. The signs shall also be subject to any restrictions that are of record. The criteria for review will be the following:

      A.     Signage Location

      B.     Letter Type. Size, Color and Spacing

      C.     Installation Methods

      D.     Sign Material Specification and Color

      E.     Elevation rendering

III.    **PERMITS**

      A.     A sign permit is required by the City of Montgomery prior to the erection of any temporary or permanent sign. The Landlord's signature is required on drawings submitted to the City for permits.

      B.     In addition, an electrical permit is required for all lighted signs. NO SIGN CAN BE INSTALLED WITHOUT THE APPROPRIATE PERMITS.

IV.    **RESTRICTIONS**

    A.    All Merchant signs shall consist of. the name of the store and may list additional merchandise or services provided approved by Landlord.

    B.    The following types of signs are prohibited:

        1. Outrigger Signs
        2. Moving Signs
        3. Rooftop Signs
        4. Iridescent Signs
        5. Painted Signs

    C.    No sign will be placed in final position without approval of the Landlord.

    D.    All signs shall be fabricated and installed in compliance with all current applicable national and local ordinances.

    E.    Exterior promotional signs and banners may be allowed by the City of Montgomery for Grand Openings and special promotions. Special permits may be required for temporary promotional signs and banners. Temporary promotional signs in windows require approval of Landlord.

V.    **GENERAL ATTACHED SIGN REQUIREMENTS**

    A.    All exterior signage must be approved by the City of Montgomery, any other regulatory agencies, and the Landlord.

    E.    The area of sign allowed for in-line Merchants and outparcels shall conform with that which is allowed by the City of Montgomery Zoning Code. Registered trademarks and logos which are graphic in nature may be included in the sign, however, the type size, style, and color must conform to this document unless an amendment is approved by the Landlord and the City of Montgomery.

VI.    **MAJOR MERCHANT SIGNS**

    N/A

VII.    **IN-LINE MERCHANTS CANOPY**

    N/A

**EXHIBIT C-1**

**Tenant's Exterior Sign Rendering**

RLPY 3006 PAGE 0307

STATE OF ALABAMA        )

COUNTY OF MONTGOMERY    )

## DECLARATION OF RESTRICTIONS

This Declaration of Restrictions ("Declaration") is made and executed as of the _9th_ day of December, 2004 by **JDM, L.L.C.**, an Alabama limited liability company (the "JDM"), and is joined in and executed by **Festival Plaza, L.L.C.**, an Alabama limited liability company ("Owner"), for the purpose of agreeing to the terms and provisions of this Declaration.

## W I T N E S S E T H:

WHEREAS, JDM is the owner of the premises described on Exhibit "A" attached hereto (the "Outparcel") and Owner is the owner of the premises described on Exhibit "B" attached hereto (the "Shopping Center Parcel") known as Festival Plaza in Montgomery County, Alabama, (the "Shopping Center"); and

WHEREAS, JDM agreed with Owner to impose the restrictions on the use of the Outparcel as stated below, in addition to those matters affecting the Outparcel by virtue of that certain Declaration of Restrictions and Easements executed by Owner, JDM and Southern Guaranty Insurance Company, which is recorded in the Office of the Judge of Probate of Montgomery County, Alabama in Real Property Book 2104, at Page 532 (herein "Existing Declaration").

NOW, THEREFORE, JDM, joined in by Owner, hereby creates, establishes and imposes the following restrictions on the ownership, use, and enjoyment of the Outparcel.

1.   **Covenants Regarding Outparcel.**

      1.1     Each grantee, tenant, or transferee from Owner, their successors and assigns (other than as set forth in paragraph 16 hereof) (collectively called "Transferee"), and by the acceptance of a deed or lease to the Outparcel, shall be deemed to have all covenanted and agreed to all the terms and conditions of this Declaration. Transferee shall design, construct, and maintain on the Outparcel: (a) at least 5.0 parking spaces for each one thousand (1,000) square feet of building area; (b) adequate and safe traffic lanes on the Outparcel; (c) all utilities entirely under ground and there shall be no lines, services, poles, wires, or other utility facilities whether similar or dissimilar which shall be constructed or permitted to remain above ground level; (d) decorative screening and/or landscaping as necessary in order to obscure from public view all trash rooms, trash holding receptacles, loading and service areas, mechanical and electrical equipment, storage facilities and bins, and other building appurtenances which may be aesthetically undesirable; and (e) appropriate screening to screen roof-mounted equipment, roof vents, and other appurtenances from public view from ground level from all directions. Transferee agrees to cause and shall cause the parking areas, sidewalks, aisles, and driveways, if any, to be located on the Outparcel (herein collectively called the "Non Building Areas") to be promptly constructed and to be completed in a good and workmanlike



**EXHIBIT**

E

RLPY 3006 PAGE 0308

manner. For purposes of the foregoing sentence, construction of those areas shall include, without limitation, the construction of adequate lighting systems therefore, the striping of parking areas, and the provision of directional markers for all driveways and aisles, if necessary. Transferee shall cause all pavement marking, directional signs, and other traffic indicators installed on the Outparcel to be compatible in all respects with those of the Shopping Center Parcel.

1.2     Subject to delays as a result of force majeure, Transferee shall cause the construction of the building and any appurtenances, including parking areas and driveways, to commence within three (3) months following the later of (i) the acquisition of the Outparcel by the Transferee (herein called the "Acquisition Date"), or (ii) Owner's approval of plans and Transferee's receipt of building permits, but in no event later than six (6) months following Transferee's acquisition of the Outparcel, and, thereafter, to proceed with all reasonable diligence in construction of same and to use best reasonable efforts to open for business within twelve (12) months after date of commencing construction. If Transferee fails to commence construction within this construction timetable, Owner shall have the option of repurchasing the Outparcel from the Transferee by providing notice of its intent to do so within thirty (30) days after the expiration of such three (3) month period, as such period may be extended as a result of force majeure, for the original purchase price paid for the Outparcel together with all documented development expenses theretofore incurred and paid by Transferee in connection with the Outparcel. In the event of any such conveyance, Transferee shall provide Owner with a title insurance policy, at Owner's expense, in the amount of the purchase price reflecting the same state of title as when Transferee acquired title to the Outparcel except for required easements granted by Transferee to utility companies during Transferee's ownership of the Outparcel. Each party shall pay its own attorney's fees associated with any such conveyance. The closing shall take place no later than ninety (90) days after Owner has provided Transferee with notice of its intent to purchase.

1.3     Transferee shall cause the initial construction of the building and any appurtenances including parking areas and driveways, if any, to be completed in accordance with the plans and specifications to be approved in advance in writing by Owner, which approval will not be unreasonably withheld, conditioned or delayed.

1.4     During and following such construction, Transferee shall maintain such building and improvements and the Non Building Areas in good order and repair and in a clean and sanitary condition and keep the Non Building Areas properly drained and reasonably free of debris, standing water, snow, ice, and potholes. Transferee shall maintain such Non Building Areas as such and shall not fence them or otherwise obstruct passage over them except curbing, shall keep them open at all times for the free use thereof as intended herein, and shall not use or permit them to be used for any purpose not contemplated by this Declaration. Nothing herein shall create or be construed to create any rights in the general public in and to all or any portion of the Outparcel, including the "Non Building Areas" defined above.

2.     In the event of the default in the performance by Transferee in the performance of its obligations under this Declaration (other than the construction requirements set forth in paragraph 1.2), Owner may give notice thereof to Transferee, and if Transferee fails to cure the default within

-2-

RLPY 3006 PAGE 0309

thirty (30) days thereafter (or if the same cannot be reasonably cured within thirty (30) days, fails to commence said cure within the thirty (30) day period and proceed diligently to cure same), Owner, at its option, may enter upon Outparcel and perform on behalf of Transferee the defaulted obligation. Transferee reserves the right to contest whether a default by Transferee exists. Transferee shall bear all reasonable costs and expenses of Owner incurred in the performance of such defaulted obligation and the amount of such expenses plus interest thereon at twelve percent (12%) per annum from the date of expenditure by Owner to the date of reimbursement by Transferee shall be payable by Transferee upon written demand by Owner. The prevailing party shall pay to the non-prevailing party the reasonable attorneys' fees and expenses incurred by the prevailing party. Nothing in this Paragraph 3. shall be deemed to limit any other remedy at law or in equity which Owner may have with respect to such default, including, without limitation, a suit or suits for injunction, specific performance and damages.

3.    **Declaration of Restrictions**.

3.1    No more than one building with appurtenant structures shall be constructed on the Outparcel and such building and appurtenant structures shall not contain more than twelve thousand (12,000) square feet of floor area in the aggregate (exclusive of exterior, covered pedestrian walkways). Such building and appurtenant structures shall be restricted in height to one story which shall not exceed twenty-four (24.0) feet measured from the finished ground floor elevation to the top of the highest building protrusion or appurtenance, including roof-mounted equipment, decorative roof screening, or other improvement, unless otherwise approved by Owner, which approval shall be in Owner's sole and absolute determination. The location, dimensions, finished floor and storefront elevations and appearance of the initial building and other improvements to be constructed on the Outparcel by Transferee shall be in accordance with a Plot Plan and a topographical plan to be approved by Owner and shall consist of materials to be approved by Owner, which approval shall be in Owner's sole and absolute determination. At least thirty (30) days prior to the commencement of any construction or alteration on the Outparcel subsequent to the construction of the initial building described above, Transferee shall submit a Plot Plan thereof to Owner showing building location and dimensions, and all physical improvements to be made to the Outparcel, including driveways, parking curb cuts, landscaping, signs, and related matters. Owner shall have fifteen (15) days to approve or disapprove such plans, which approval shall be in Owner's sole and absolute determination. It is recognized that Owner has a strong interest in maintaining, preserving, and protecting: (a) visibility that does not unreasonably interfere with the stores on the Shopping Center Parcel from the adjoining public roads, (b) an aesthetically attractive physical environment and architectural harmony for the Shopping Center, and (c) a wholesome family oriented environment for the Shopping Center.

3.2    Except as may be otherwise approved in advance in writing by Owner, no building or sign may be constructed on the Outparcel; provided, however, any such approval is nevertheless subject to any and all required governmental and administrative approvals, laws, rules and regulations.

RLPY 3006 PAGE 0310

3.3    The Outparcel shall be used initially as a typical "Men's Warehouse" store and additional retail shops and/or offices normally found in other similar type shopping centers, and such businesses and any other businesses conducted on the Outparcel shall be conducted in a first class, reputable manner. Subsequent to the initial use described above, the Outparcel shall be used only for commercial retail and office purposes normally carried in other similar type shopping centers, but shall not be used for any purpose which is not in harmony with the Shopping Center and shall not be used for any of the following purposes:

(a)    Any public or private nuisance;

(b)    Any noise or sound that is objectionable due to intermittence, beat frequency, shrillness, or loudness, other than the drive thru speaker;

(c)    Any obnoxious odor which shall not include odors customarily associated with normal restaurant operations;

(d)    Any noxious, toxic, or caustic or corrosive fuel or gas;

(e)    Any dust, dirt, or fly ash in excessive quantities;

(f)    Any unusual fire, explosion, or other damaging or dangerous hazard (including the storage, display, or sale of explosives or fireworks);

(g)    Any warehouse, funeral parlor, movie theater, bowling alley, or flea market;

(h)    Any assembling, manufacturing, distilling, refining, smelting, tanning, agriculture, or mining operations;

(i)    Any establishment receiving substantial revenues from selling or exhibiting pornographic materials;

(j)    Any mortuary;

(k)    Any massage parlor;

(l)    Any cafeteria, theater, bowling alley, billiard parlor, night club or other place of recreation or amusement or any business serving or selling alcoholic beverages (other than in connection with a full-service restaurant);

(m)    Any retail supermarket or grocery store or other business dealing in the sale of groceries for off-premises consumption;

– 4 –

RLPY 3006 PAGE 0311

(n)    Any drug store;

(o)    Any health club, spa, workout center, gymnasium or similar facility;

(p)    Any car lot, car wash, mobile home or trailer lot;

(q)    Any movie theatre;

(r)    Any sandwich shop;

(s)    Any ice cream shop;

(t)    Any restaurant serving pizza;

(u)    Any retail shop which specializes in men's and boy's outdoor clothing and related accessories as its primary line of business;

(v)    Any jewelry store;

(w)    Any florist;

(x)    Any bakery or store selling bakery goods;

(y)    Any video gaming or movie rental or sales store; and

(z)    Any use which violates the Existing Declarations.

3.4    No noxious or offensive activity shall be carried on upon the Outparcel.

3.5    All trash and garbage on the Outparcel shall be stored in adequate containers outside of the structure on the Outparcel provided it is properly contained and such container is properly screened (with split-face block screening, painted and gated), all as shown on building plans and plot plan approved by Owner in writing. No trash or garbage shall be burned at any time in or about the Outparcel. If such garbage includes food and/or drink, then such trash and garbage shall be stored in a screened dumpster.

3.6    The Outparcel and all structures thereon shall be maintained in good order and good, clean, neat, and safe condition and all glass, including windows, doors, fixtures, and skylights shall be maintained in clean and good condition, and if broken or damaged shall be replaced promptly. The Outparcel shall be kept free of any accumulation of trash or debris.

RLPY 3006 PAGE 0312

3.7    No fence, wall, hedge, shrub or planting shall be placed or permitted to remain on the Outparcel except as approved by Owner.

3.8    Transferee shall install, preserve, and maintain on the Outparcel such shrubbery, trees, and other landscaping in an amount harmonious and consistent with the landscaping of the Shopping Center and shall cause such landscaping to be reasonably protected from vehicular traffic.

3.9    All signs on the Outparcel shall comply with all of the following restrictions at all times:

(a)    All signs shall be maintained in first class condition and repair and shall be in compliance with all governmental and administrative agencies, statutes, rules, regulations and ordinances;

(b)    All signs must have individual channelled-lit-letters (any raceway sign is prohibited);

(c)    Except as may be set forth in the approved plans and specifications, the following kinds of exterior signs are prohibited: (i) any painted sign on walls, sign bands, storefronts or store windows; (ii) any wood or plywood sign except for temporary signs; (iii) any sign made of paper, cloth, or cardboard; (iv) any sign consisting of stickers, flags, or pennants; (v) any roof-mounted sign which protrudes higher than the peak of the roof; (vi) any flashing, pulsating, moving, or animated sign and any sign emitting any sound, smoke, or odor; (vii) any portable sign on the Outparcel or on the adjacent right-of-way to the Outparcel; (viii) any exposed neon lighting or other lighting tubes, bulbs, or devices; (ix) any sign perpendicular to the façade; or (x) any banners.

(d)    Except as may be set forth in the approved plans and specifications, the content of all exterior signs shall be limited to letters designating the store name, a corporate logo, and a reader board that may contain slogans, symbols, markers, prices, items for sale, or other similar items;

(e)    Except as may be set forth in the approved plans and specifications, no more than one building mounted sign shall be permitted on any one wall or facade of the building; and

(f)    No sign shall be on so called "portable" or similar type sign or have any bulbs or other forms of lighting that go on and off intermittently.

3.10    Transferee shall at all times, at its sole cost and expense, continuously maintain comprehensive general liability insurance, endorsed to cover personal injury and contractual liability, covering the buildings, parking and other Non-Building Areas of the Outparcel. The limits of Transferee's insurance shall never be less than: (a) $1,000,000.00 for death of, or

RLPY 3006 PAGE 0313

bodily injury to, or personal injury to one or more persons resulting from one occurrence; and (b) property damage to the limit of not less than $500,000.00 for each occurrence. Transferee shall, upon written request therefore, at all times provide and deliver to Owner copies of such policies or certificates of such insurance in full force and provision shall be contained therein that none of the same may be canceled by the insurer without at least twenty (20) days prior written notice to Owner.

4.     If all of the space in the building on the Outparcel goes dark and remains closed for a period of six (6) months (except that in case of damage by fire or other casualty the period shall be extended to nine (9) months, unless within such nine (9) month period Transferee has commenced rebuilding or restoration and is actively and diligently proceeding with completion thereof), Owner shall have the option to repurchase the Outparcel at the Fair Market Value of the Outparcel unless, prior to Owner's notifying Transferee that it is exercising such option, Transferee notifies Owner that it has a bona fide sale of the Outparcel, in which event the provisions of Paragraph 1.2 shall apply. Fair Market Value shall be computed by a panel of three appraisers, one selected by Transferee, one selected by Owner, and the third selected by the other two appraisers. Each appraiser shall independently appraise the Outparcel with the Fair Market Value to be the average of the three (3) values.

Owner shall have the right to exercise the option for as long as the premises stay dark. This option shall expire on December 31, 2034.

5.     In the event of damage or destruction of the building or other improvements on the Outparcel, Transferee covenants that if it does not within a reasonable period of time after such damage or destruction commence to repair and restore the same to the same condition as the same were in immediately prior to such damage or destruction, it shall promptly clear the Outparcel of all debris and hazardous conditions and shall leave, keep and maintain the same in a grassed, landscaped, clean, safe, sightly and attractive condition.

6.     This instrument shall inure to the benefit of Owner, its successors and assigns, and shall be recorded in the public records of Montgomery County, Alabama.

7.     The obligations and benefits of Transferee under this instrument shall be binding upon and inure to the benefit of Transferee, its successors and assigns in and to the Outparcel, and all persons from time to time owning any interest in all or any portion of the Outparcel.

8.     In no event shall this instrument be construed as combining the Outparcel and the Shopping Center Parcel into one lot for zoning purposes, it being agreed that as between the owners of the Outparcel and the Shopping Center Parcel that each parcel shall constitute a separate zoning lot and that any use of any such lot shall conform to parking and other zoning requirements without regard to the existence of this Declaration. This document does not create, and shall not be construed as creating, any easement between the Outparcel and the Shopping Center Parcel.

RLPY 3006 PAGE 0314

9.    Invalidation of any one or more of the covenants, restrictions, or other terms contained herein by a judgment or court order in no way shall affect any of the other provisions which shall remain in full force and effect.

10.    The covenants and restrictions created pursuant to this document shall become effective on the date hereof, shall be binding upon all parties hereto and all persons claiming by, through, or under them, and shall constitute covenants running with the land burdened thereby, and shall be binding on such land and every part thereof or improvement thereof, and their respective successors and assigns, and shall inure to the benefit of Owner. The covenants and restrictions created by this Declaration shall automatically expire on December 31, 2049, unless prior thereto the Shopping Center Parcel ceases to be used as a shopping center for a continuous period of two (2) years. Owner, and only Owner, shall have the right to obtain injunctive relief to enjoin any violation, or the continuation of a violation, of any of the restrictions, covenants, terms and conditions of this Declaration.

Nothing herein is intended to create or shall be construed to create any rights whatsoever for the benefit of the general public in the Outparcel or the Shopping Center Parcel or in any improvements constructed thereon.

"Owner" as used herein shall mean the declarant who executes this document and its successors and assigns of the Shopping Center Parcel.

11.    Each owner, grantee, lessee, and occupant of all or any portion of the Outparcel shall be deemed by the acceptance of the conveyance, grant, lease, delivery, or possession thereof, to have accepted the covenants and restrictions provided in this Declaration and to have agreed to comply with the terms stated herein and to have accepted whatever right, title, or interest in the Outparcel so received subject to all the terms and conditions of this document.

12.    Any notice, request, demand, approval, consent or other communication which Owner or Transferee may be required or permitted to give to the other parties shall be in writing and shall be mailed by certified mail, return receipt requested to the other party at the address specified below, or to such other address as either party hereof shall have designated by notice to the other:

If To Owner:        Festival Plaza, L.L.C.
                    2777 Zelda Road
                    Montgomery, Alabama 36106


If To Transferee:   [intentionally left blank]

13.    This document may be modified in whole or in part only by a written instrument executed by the then Owner and Transferee of the Shopping Center Parcel and Outparcel, respectively.

— 8 —

RLPY 3006 PAGE 0315

14.    This document shall not restrict any party's right to assign or convey its interest in its parcel or in this document to a mortgagee as additional security or collateral security. However, any and all mortgages granted to mortgagees on any parcel shall be subordinate and subject to this document and any person foreclosing any such mortgage or acquiring title to a parcel affected thereby shall do so subject to all of the terms of this document. Upon receipt of a written request by any party or by such mortgagee, all other parties shall thereafter send any such mortgagee, or the requesting party copies of all notices given in accordance with any provisions of this document. Once any such party or its mortgagee has so notified the other parties, no notices sent hereunder by any other party shall be binding on said mortgagee unless and until such mortgagee receives a copy thereof; provided, however, that such notices shall be effective as between the other parties in accordance with the terms and conditions contained in this document. Any notice given by or to any such mortgagee shall be given by the means set forth herein, and shall be deemed given, as provided in this document.

15.    The provisions hereof are in addition to any covenants and restrictions now appearing of public record affecting title to the Outparcel, including the Existing Declaration.

16.    Notwithstanding anything contained herein to the contrary, the term "Transferee" shall not apply to JDM so long as it shall own the Outparcel, but shall apply to each and every other "Transferee" as set forth herein.

[EXECUTION BEGINS ON NEXT PAGE]

— 9 —

RLPY 3006 PAGE 0316

IN WITNESS WHEREOF, JDM, joined in by Owner, has caused this Declaration to be duly executed and delivered as of the day and year first above written.

**JDM, L.L.C.,**
an Alabama limited liability company

By: _____
    Joel D. McClinton
    Its Manager


**Festival Plaza, L.L.C.,**
an Alabama limited liability company

By: Festival Plaza Management, Inc.,
    an Alabama corporation
    As Its Manager

By: _____
    Joel D. McClinton
    Its President


**[ACKNOWLEDGMENTS BEGIN ON NEXT PAGE]**

RLPY 3006 PAGE 0317

STATE OF ALABAMA                )
                               :
COUNTY OF MONTGOMERY            )

I, the undersigned authority, a Notary Public in and for said State-at-Large, hereby certify that Joel D. McClinton, whose name as Manager of JDM, L.L.C., an Alabama limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of such instrument, he, as such Manager and with full authority, executed the same voluntarily for and as the act of said limited liability company.

Given under my hand and seal this the _9th_ day of December, 2004.

Notary Public
My Commission Expires: _10 -13 - 08_

(SEAL)

STATE OF ALABAMA                )
                               :
COUNTY OF MONTGOMERY            )

I, the undersigned authority, a Notary Public in and for said State-at-Large, hereby certify that Joel D. McClinton, whose name as President of Festival Plaza Management, Inc., an Alabama corporation, acting in its capacity as Manager of Festival Plaza, L.L.C., an Alabama limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of such instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation, acting in its capacity as Manager as aforesaid.

Given under my hand and seal this the _9th_ day of December, 2004.

Notary Public
My Commission Expires: _10 -13 - 08_

(SEAL)

This instrument was prepared by:
Jeffrey W. Blitz, Esq.
Rushton, Stakely, Johnston & Garrett, P.A.
Post Office Box 270
Montgomery, Alabama 36101-0270
(334) 206-3100
McClinton\Festival Plaza\Cofer\Declaration of Restrictions\Declaration of Restrictions (12-9-04)
2975-34
120920040810

– 11 –

RLPY 3006 PAGE 0318

## EXHIBIT "A"

### (Legal Description – Outparcel)

Outlot 3, according to the Map of Festival Plaza Plat No. 2, as the same appears of record in the Office of the Judge of Probate of Montgomery County, Alabama, in Plat Book 48, at Page 175.

RLPY 3006 PAGE 0319

EXHIBIT "B"

(Legal Description – Shopping Center Parcel)

Lot No. 1, according to the Map of Festival Plaza Plat No. 2, as the same appears of record in the Office of the Judge of Probate of Montgomery County, Alabama, in Plat Book 48, at Page 175.

INDEX          5.
RECORD FEE     1.
RECORD FEE    32.
CASH          38.

ITEM    3
12-09-2004 #1    1CL         6930 17:

STATE OF ALABAMA
MONTGOMERY CO.
I CERTIFY THIS INSTRUMENT
WAS FILED ON

2004 DEC -9  PM 4: 12

REESE McKINNEY, JR.
JUDGE OF PROBATE